**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-341-CKK** |
| **JOHN DOUGLAS WRIGHT,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence John Douglas Wright to 60 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.     INTRODUCTION

The defendant, John Douglas Wright, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Wright used Facebook to organize two buses to travel to Washington, D.C., on January 6, 2021, to protest the certification of the 2020 Presidential election. Wright charged $50 per person to ride on his buses, and he transported approximately 100 people from Ohio to Washington, D.C. Wright parked his buses at Union Station. Wright then walked with his group directly to the U.S. Capitol, entering the grounds on the East Front. Wright, who was wearing a red hoodie with the words, "Trump Pence 2020," approached U.S. Capitol Police officers who were maintaining a barricade line of waist-high metal fencing. Together with others, Wright physically pushed the metal fencing against police officers as part of the first attempt to break through that group of officers on the East Front and advance towards the U.S. Capitol.

After failing to breach the barricade line, Wright retreated from the front and rested. Approximately 15 minutes later, other rioters pushed through the barricade line and, ultimately, breached the East Front doors of the U.S. Capitol. Wright entered the Capitol building through those open doors. Once inside, Wright walked through the Capitol Rotunda, took pictures, streamed video to Facebook Live, and smoked a cigarette while inside the Rotunda. Wright then exited the building.

Preceding and following January 6, 2021, Wright repeatedly used social media to convey his thoughts and purpose behind his conduct at the Capitol. For example, on January 5, 2021, Wright sent the following threatening messages on his Facebook account, "WE ARE GOING TO HAVE TO FIGHT THE BLUE TOMORROW… FROM WHAT I SEEN TONIGHT TEMPERS WILL BE UP TOMORROW AND POLICE LINES WILL BE BREACHED… THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE GOING IN AND DRAG THEM OUT." After returning to Ohio from Washington, D.C., on January 7, 2021, Wright posted, "IT'S

FUCKING WAR TIME… NO MORE PROTESTING… YESTERDAY WAS A PRACTICE RUN." Additionally, on January 7, 2021, Wright was interviewed by the Canton Repository newspaper, and he said of the attack on the Capitol, "Yesterday wasn't the end. Yesterday was the first battle of the war. I promise you." Also, on January 7, 2021, a tipster informed the FBI that Wright had told the tipster he planned to return to Washington, D.C. on January 17, 2021, and bring firearms.

The government recommends that the Court sentence Wright to 60 months' incarceration, which the government submits is the correct Guidelines calculation, for his violation of 18 U.S.C. §§ 1512(c)(2) and 2. A 60-month sentence reflects the gravity of Wright's conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Wright among them, unlawfully broke into the U.S. Capitol building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the Capitol building and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, No. 21-cr-00054, Tr. 10/4/2021 at 25 ("A mob isn't a mob

without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 16-21.

**B.**     **Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Facebook Activity Preceding January 6*

John Douglas ("Doug") Wright, a charter bus business owner from Canton, Ohio, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, videos and pictures seized from devices operated by other January 6 rioters, body worn camera video recordings from the Metropolitan Police Department, open source videos, surveillance footage from the exterior and interior of the Capitol, his own statements to investigators, and statements Wright made on his Facebook account.  Wright was very active on social media. As shown in Exhibit 1,[2] Wright's Facebook profile picture depicted Wright with the statement: "When Tyranny Becomes Law, Resistance Becomes Duty."

Prior to the January 6 attack on the Capitol, Wright posted to his and others' Facebook pages, Facebook groups, and carried on many private conversations in Facebook messenger. Wright frequently shared his opinions, videos, images, news articles, and memes. A considerable amount of Wright's Facebook activity concerned politics and his support for President Trump. As shown below in Exhibits 2, 3, and 5, Wright believed that a significant conflict was imminent and that he was prepared to commit violence in furtherance of his political goals.

---

[2] Many exhibits, including Wright's text-based Facebook posts, are not included in the body of this memorandum. All exhibits are attached in full to this memorandum for the Court's consideration.

On January 5, 2021, at approximately 10:54 p.m., as shown in Exhibit 2, Wright updated his Facebook status to read, "TODAY WE TAKE GEORGIA TOMORROW WE TAKE OUR COUNTRY BACK (SOUND FAMILIAR)."

On January 5 at 10:57 p.m., Wright exchanged Facebook messages with a Facebook contact ("FB Contact 1"), as shown in Exhibit 3. Wright stated that he anticipated fighting with police on January 6, stating, "WE ARE GOING TO HAVE TO FIGHT THE BLUE TOMORROW." Wright continued, "FROM WHAT I SEEN TONIGHT THE TEMPERS WILL BE UP TOMORROW AND POLICE LINES WILL BE BREACHED… WE HAVE TO PUSH THRU." Wright advised that he anticipated the Capitol building would be breached and that violence would be directed at elected officials who were engaged in the election certification process, stating, "THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE GOING IN AND DRAG THEM OUT." Wright suggested that he could die during in the riot, adding, "HOPE I MAKE IT THROUGH." Wright proposed after rioting in Washington, D.C., that he and others could travel on January 7 to Georgia, where an election runoff had just occurred: "MAYBE WE WILL ALL BE IN GEORGIA THURS… PROTESTING IS GETTING US NOWHERE." On January 6, at approximately 8:40 a.m., FB Contact 1 messaged Wright, "Praying for all of you today."

Also on January 5, Wright posted an image, Exhibit 4, to his Facebook page and to a Facebook group of individuals interested in traveling from Ohio to Washington, D.C., promoting another protest scheduled to occur on January 17. The protest was described as an "Armed March on Capitol Hill and All State Capitols." The post also read, "Come armed at your personal discretion." Wright later removed the image from his Facebook page.

On January 6 at approximately 12:27 a.m., Wright exchanged Facebook messages with a Facebook contact ("FB Contact 2"), as shown in Exhibit 5. Wright advised, "ALMOST WAR TIME." FB Contact 2 replied, "Yep! And they are stealing Georgia run offs as we speak." Wright replied, "I KNOW… THAT WILL BE THE 2ND BATTLE FIELD." FB Contact 2 advised, "I believe war begins tomorrow for Trump." Wright replied, "FOR US." Referring to elected officials evacuating the U.S. Capitol building on January 6, FB Contact 2 advised, "You know they are gonna sneak through the tunnels instead of coming out the building. People need to find the tunnel exits and get them." Wright replied, "DONE… ALL PLANNED OUT." FB Contact 2 replied, "I knew you was ahead of the game."

A review of the recovered material from Wright's Facebook account also revealed that Wright used his account to arrange for two of his charter buses to travel on January 6 from Canton, Ohio, to Washington, D.C., to protest the certification of the 2020 election results. Wright created two Facebook Event pages to promote and coordinate travel, which were entitled, "CANTON/CLEVELAND ELECTION PROTEST BUS TRANSPORTATION (SOLD OUT)" and "CANTON/AKRON ELECTION PROTEST BUS TRANSPORTATION (SOLD OUT)," as shown in Exhibit 6.

On December 29, 2020, Wright shared an image to his Facebook page advertising that one of his charter buses would be traveling from Canton to Akron, and then to Washington, D.C., as shown in Exhibit 7. The stated purpose for the trip was to "BE IN ATTENDANCE FOR THE ELECTORAL VOTE AND TO SUPPORT OUR PRESIDENT DONALD J TRUMP." The announcement included a price of $50 per bus seat.

Leading up to January 6, recovered Facebook messages showed Wright discussing travel arrangements with many interested protestors who planned to ride on Wright's buses, as shown in Exhibits 8 through 15.

On January 6, approximately 100 people, including Wright, traveled from Canton, Ohio to Washington, D.C., on Wright's two charter buses.

### *Approach to the Capitol*

On January 6 at approximately 11:30 a.m., both of Wright's buses arrived at Union Station in Washington, D.C., and parked. Wright, together with most of the passengers from his buses, walked to the East Front of the Capitol grounds. Wright later informed agents that he did not attend any of the "Stop the Steal" rally speeches because the speeches were being conducted on the National Mall. Wright advised that he walked to the East Front because it was closer to where he had parked, and he had seen on social media that protests were taking place at the Capitol. Wright also advised agents that he believed President Trump had asked his supporters to march to the Capitol.

Surveillance video of the East Front of the Capitol on January 6, Exhibit 16, shows the crowd of protesters grew in size and fervor as the morning progressed.



*Sill from Exhibit 16, Timestamp 00:33, 1:42 p.m.*

As with other barricades surrounding the Capitol on January 6, the barricade line on the East Front was constructed of waist-high metal fencing with U.S. Capitol Police officers posted on the side of the fencing opposite protesters, as shown in Exhibits 17, 18, and 63.



*Exhibit 17*

8



*Exhibit 18*

As depicted in Exhibit 19, a protestor claiming to live stream the events of January 6 captured Wright on his video feed. Wright is shown on the East Front of the Capitol grounds wearing a red hoodie with the words, "Trump Pence 2020," and a camouflage beanie hat with the words, "Trump, Make America Great Again." Protestors around Wright were using means of sound amplification, including microphones, megaphones, and musical horns, to protest the certification of the 2020 election, which was underway inside the Capitol building at that time.



*Still from Exhibit 19, Timestamp 16:52*



*Still from Exhibit 19, Timestamp 19:17*

Protestors, including Wright, were shouting their support of objections made by Members of Congress to the counting of votes from certain states during the election certification process. As shown in Exhibit 19, Wright can be heard cheering and raising his fist above his head. The protestor claiming to live stream the events then addressed Wright directly and asked, "Doug, what is it? What is it?" Wright responded, "We got an objection from Pennsylvania and Arizona. We got two! We got two!"



*Still from Exhibit 19, Timestamp 19:10*

Less than ten minutes later, the protestor who was live streaming addressed Wright again and said, "Arizona is split in there as we speak. It's a beautiful thing." Wright commented, "We got Pennsylvania too."

12

### *Pushing Against the Barricade Line*

As the crowd of protesters on the East Front grew larger and more agitated, Wright made his way to the front of a barricade line.



*Still from Exhibit 16, Timestamp 00:40, 1:42 p.m.*

At approximately 1:43 p.m., as shown in Exhibits 16, 19 through 24, and 63, protestors at the barricade line questioned U.S. Capitol Police officers' authority and patriotism, shouted profanity and abuse, demanded entry further into the Capitol grounds and building, and, eventually, physically pushed metal fencing against U.S. Capitol Police officers in an effort to advance towards the Capitol. Wright was part of the group of rioters who pushed against the metal fencing being held by U.S. Capitol Police officers.

Initially, as shown in Exhibits 20, 21, and 63, Wright and other rioters were yelling at U.S. Capitol Police officers posted on the barricade line.

13



*Exhibit 20*

As depicted in Exhibit 19, Timestamp 44:25, Wright addressed a U.S. Capitol Police officer at the barricade line and said, "Don't touch me! You just did!" Wright then proceeded to push against the metal fencing and police officers.

As shown in Exhibits 21, 22, 23, and 63, Wright and the group of rioters lifted a section of metal bicycle fencing from the ground and pushed the fencing forward, as U.S. Capitol Police officers struggled to maintain their position on the barricade line. In Exhibits 22 and 23, Wright is shown to be acting of his own accord and he was not being pushed from behind by other rioters.



*Still from Exhibit 22, Timestamp 00:16*



*Still from Exhibit 22, Timestamp 00:30*



*Still from Exhibit 63, Timestamp 13:20*



*Still from Exhibit 23, Timestamp 00:00*

During the above-described moment, a photojournalist captured images of Wright pushing

metal fencing against U.S. Capitol Police officers from the vantage point of the officers, as shown

16

in Exhibit 24. Wright later shared this same picture with his Facebook contacts and proudly exclaimed that he was the one in the red hoodie, as shown in Exhibits 25 and 37.



*Exhibit 24*

As result of Wright and the other rioters' pushing against the metal fencing, the barricade line was temporarily breached, and a few rioters spilled into the open space on the East Front between the barricade line and the Capitol steps. Rioters, including Wright, continued to fight with U.S. Capitol Police officers for control of the metal fencing at the front of the barricade line, as shown in Exhibits 16, 21, 23, 26, 27, 28, and 63. *See also U.S. v. Hemphill,* No. 21-cr-00555 (RCL), ECF 32 at 6-8 (describing the breach of the barricade line on the East Front of the Capitol grounds).



*Exhibit 26*



*Exhibit 27*

However, as shown in Exhibits 16, 21, and 63, U.S. Capitol Police officers were able to resecure the metal fencing and marshal rioters who had broken through to return behind the barricade line.

After the failed attempt to breach the barricade line, Wright retreated from the front and sat down. Wright later informed agents that he was winded and needed to catch his breath. Wright had participated in the fight at the barricade line for approximately 10 minutes.

While Wright rested, other rioters continued to fight for control of the barricade line. At approximately 2:00 p.m., rioters on the East Front broke through the metal fencing again and forced their way past U.S. Capitol Police officers, as shown in Exhibit 16. On this occasion, U.S. Capitol Police officers were not able to hold rioters back or resecure the barricade line. Wright did not participate in this second effort.

A large group of rioters then advanced towards the Capitol building and marched up the East Front stairs, as shown in Exhibits 16, 29, and 30.

### *Wright's Entry into the Capitol Building and Rotunda*

Once the barricade line was breached, Wright walked to the base of the East Front stairs. There, at approximately 2:16 p.m., Wright live streamed video to his Facebook account, as shown in Exhibit 31. Wright can be heard stating, "We are in the house! All's we gotta do is get the door down now! We're gonna drag their stupid asses out! Yep, that's the stairwell. It took a lot of beating, but we got in here!"

At approximately 2:19 p.m., Wright uploaded another video to his Facebook account from the vantage point of the East Front stairs, as shown in Exhibit 32. Wright can be heard saying, "Alright, alright, lookee here. Hey, look at all these patriots coming in. They're still coming in! That's right, we American citizens, we're not gonna stand back and take this bullshit!" Wright

19

participated in a "Stop the Steal" chant. Wright then began a call-and-response chant with the crowd of "Whose house? Our house!" Wright concluded, "You're damn right it's our house! Them's [U/I] gotta go! Time to get rid of the criminals!"

At the top of the East Front stairs, rioters gathered at the East Front doors, which lead directly into the Rotunda. At approximately 2:20 p.m., as shown in surveillance video from inside the Capitol building, Exhibit 33, rioters smashed the windows of the East Front doors.

At approximately 2:25 p.m., as shown in surveillance video, Exhibit 33, rioters who had entered the Capitol building from a different breach point opened the East Front doors from the inside, which allowed rioters amassed outside to enter the building.

At approximately 2:28 p.m., as shown in surveillance video, Exhibit 33, the East Front doors were temporarily resecured by four U.S. Capitol Police officers. These officers barricaded the East Front doors with three metal benches and then responded to a different area of the Capitol.

At approximately 2:35 p.m., as shown in surveillance video, Exhibit 33, rioters who had entered the Capitol building from a different breach point moved the three metal benches and again opened the East Front doors from the inside.

As shown in Exhibits 33 and 34, Rioters amassed outside the East Front doors then entered the Capitol building. On this occasion, U.S. Capitol Police officers were not able to hold rioters back or resecure the East Front doors.

At approximately 2:39 p.m., as shown in Exhibits 33 and 34, Wright entered the Capitol building through the open East Front doors.



*Still from Exhibit 33, Timestamp 25:00*

Wright traveled further into the building to the Rotunda, as shown in Exhibits 34 and 35.



*Still from Exhibit 35, Timestamp 00:19*

Inside the Rotunda, Wright live streamed video to his Facebook account, as shown in Exhibit 36. Wright filmed an unknown male rioter waving a flag. Wright can be heard saying, "Yeah, this is what the inside looks like. We are in our house!" As shown in Exhibit 35, Wright can be seen holding his cell phone in a manner consistent with filming the unknown male rioter.

21



*Still from Exhibit 35, Timestamp 00:48*

Also, while he was inside the Rotunda, Wright sat on a bench and smoked a cigarette.

After remaining in the Rotunda for approximately 10 minutes, Wright left the Capitol building by the same route that he had entered, as shown in Exhibits 35 and 38.



*Exhibit 38, Timestamp 4:00*

Wright exited through the open East Front doors at approximately 2:50 p.m., as shown in Exhibits 33, 38, and 39. Wright was inside the Capitol building for approximately 12 minutes.

22



*Still from Exhibit 33, Timestamp 36:40*

After Wright exited the Capitol building, he remained at the top of the stairs near the East Front doors, as shown in Exhibit 40. Wright later informed agents that during that time, he witnessed a rioter yelling at a black police officer and using a racial slur. Wright claimed that he intervened and told the rioter to stop harassing the officer.

At approximately 4:00 p.m., Wright departed Washington, D.C., via one of his charter buses for Ohio.

### Wright's Interview with a Newspaper Reporter

On January 7, 2021, Wright participated in an interview with the Canton Repository newspaper, Exhibit 41, *available at* https://www.cantonrep.com/story/news/2021/01/07/stark-county-man-says-patriots-peaceful-protest-outside-capitol/6587686002/. According to the article, Wright contested the outcome of the 2020 Presidential election. The article explained that Wright had previously attended an election protest in Ohio: "Wright was among a group of Trump supporters who for several days rallied for the president outside Stark County [Ohio] Board of Elections offices." The article included a photograph of Wright from October 2020 at the above-

23

described rally at the Board of Elections offices. Wright is depicted wearing what appears to be the same red hoodie with the words, "Trump Pence 2020," that he wore on January 6.



*Exhibit 41, Photograph of Wright from Oct. 2020*

According to the article, "Wright said he was among those who took part in demonstrations for Trump in Washington, D.C. He declined to say whether he was among those who stormed the Capitol." Wright was quoted, "We didn't burn nothing down. We didn't kill nobody." Wright claimed to have been "beaten by cops," but also that "he was part of a peaceful demonstration." Wright stated, "They [elected officials] just want control. We're fighting corruption." Wright disagreed with the characterization of the January 6 attack on the Capitol as a riot. However, "He acknowledged the protestors pushed and pushed, then entered the Capitol building." Of those who participated in the riot, Wright asked, "But now we're called criminals?" Wright claimed ownership of the Capitol building, stating, "It's our office. We run this country, not them [elected

officials]. They work for us." Wright compared the events of January 6 to other protests, claiming, "If BLM or antifa were in there [U.S. Capitol], they would have burnt that [building] down because that's their MO." Wright further informed the newspaper that protestors were not done. "He said he's seen that more protests are planned for January 17 near the Capitol." At the conclusion of the article, Wright was quoted, "Yesterday wasn't the end. Yesterday was the first battle of the war. I promise you."

### Tipster Informed FBI of Wright's Plan to Return to D.C.

On January 7, 2021, a tipster informed the FBI that Wright told the tipster he planned to return to Washington, D.C., on January 17. This time, the tipster alleged, Wright said he planned to bring firearms. According to the tipster, Wright said he was "going to get them this time," referring to either police or elected officials. Wright falsely told the tipster that on January 6 he had been sprayed with chemical irritants and forced to the ground by police while inside the Capitol building. Agents noted that this tip was consistent with an image posted to Wright's Facebook page on January 5, Exhibit 4, which promoted another protest described as an "Armed March on Capitol Hill and All State Capitols" and scheduled to occur on January 17.

### Wright's Facebook Activity Following January 6

Recovered Facebook material showed Wright continued to use his account to discuss the events of January 6, threaten physical harm against elected officials, and plan travel to other political rallies, as shown in Exhibits 12, 25, 37, and 42 through 61. For example, on January 6 at approximately 4:23 p.m., Wright received a series of messages from, and then spoke to a Facebook contact ("FB Contact 12"), as shown in Exhibit 42. Immediately thereafter, FB Contact 12 sent the following message, "Just spoke with Doug [Wright]. They all are on their way home. A bit beat

up but ok. They were on the front lines and did what they set out to do. He's driving so more as he gets back. Proud of our Ohio patriots! Holding the line!"

On January 7 at approximately 2:18 p.m., Wright exchanged messages with a Facebook contact ("FB Contact 13"). As shown in Exhibit 43, Wright advised, "RESTING UP FOR THE NEXT BATTLE… GETTIN TO OLD TO BE A FRONTLINER." FB Contact 13 replied, "[Laughing my ass off] i was rolling when I seen you were "in" there. You're a damn nut!!!" Wright replied, "DAMN PISSED OFF PATIOTS."

On January 7 at approximately 2:43 p.m., Wright updated his status to read, "YESTERDAY WAS A PRACTICE RUN," referring to the January 6 attack on the Capitol, as shown in Exhibit 45.

On January 7 at approximately 3:52 p.m., Wright sent messages to a Facebook contact ("FB Contact 15"), as shown in Exhibit 46. Wright stated, "IT'S FUCKING WAR TIME… NO MORE PROTESTING."

On January 7 at approximately 3:53 p.m., as shown in Exhibit 47, Wright posted a picture to his Facebook page, which read, "The Constitution Actually says you Can legally Overthrow your Government if they Are tyrannical."

As referenced above, on January 7 at approximately 6:05 p.m., Wright exchanged messages with FB Contact 11, as shown in Exhibit 37. Wright shared a picture of himself pushing metal fencing against U.S. Capitol Police officers, Exhibit 24, stating, "I AM IN RED HOODIE." Wright repeated, "I AM RED HOODY." FB Contact 11 replied, "I love it, did you get in?" Wright replied, "SET ON NICE BENCE IN ROTUNDA AND HAD A SMOKE."  FB Contact 11 replied, "I'm ready for sure next time."

On January 7 at approximately 7:59 p.m., Wright exchanged messages with a Facebook contact ("FB Contact 16"), as shown in Exhibit 48. In that conversation, FB Contact 16 asked, "Are you guys planning on going back to DC[?]" Wright replied, "LOADED." FB Contact 16 asked, "When do you plan on going[?]" Wright replied, "17TH." Wright then advised FB Contact 16 that he thought protesters should go to the homes of elected officials, stating, "I THINK WE NEED TO MAKE HOME VISITS."

On January 8 at approximately 6:48 a.m., as shown in Exhibit 12, a Facebook contact ("FB Contact 7") sent a message to Wright, which read, "We need to start protesting at the capitol in Columbus. What do you think about having one of your busses take a bunch of us down there? That would make it easy for us all to get there together and you could make some income while were at it!" Wright replied with a thumbs up emoji.

On January 8 at approximately 10:55 a.m., Wright exchanged messages with a Facebook contact ("FB Contact 19"), as shown in Exhibit 51. In that conversation, Wright disclosed, "ONE OF MY PASSENGERS IS ON THE LIST… IN PELOSIS OFFICE." FB Contact 19 replied, "Oh damn! … Did it seem like they just let people in? … Cause that's how it looked." Wright replied, "NOT ON THE EAST SIDE WHERE I WAS." Referring to police, FB Contact 19 advised, "I don't know how they can prove anything. There were millions of people there."

On February 9, the date on which impeachment proceedings in the U.S. Senate began, Wright updated his Facebook story throughout the day and commented on the proceedings, as shown in Exhibit 54. Referring to elected officials, Wright stated, "TO BAD THEY ARE STILL BREATHING… THESE FUCKERS MAKE ME WANT TO PUKE… WE THE PEOPLE NEED TO LET THEM KNOW WHO THEY WORK FOR… FUCKIN PUSSY UP THERE CRYIN

THE BLUES." Referring to the January 6 attack on the Capitol, Wright falsely claimed, "JUST REMEMBER NOBODY STOPPED THE PATRIOTS FROM GETTING TO THE IDIOTS. THEY CHOSE TO TURN BACK." Wright continued, "RASKIN IS A PUSSY."

On February 23 at approximately 1:36 a.m., Wright exchanged a series of Facebook messages with FB Contact 7, as shown in Exhibit 12. Wright said, "I KNOW IT WOULD TAKE A LONG TIME TO RECOVER FROM BUT THERE IS ONLY ONE WAY TO GO… WAR." Wright advised, "THE REAL DOMESTIC TERRORISTS ARE IN DC." Later in the conversation Wright stated, "WHAT WE NEED IS A RESET 1776… CAN'T DO HARM 6FT UNDER…" Wright continued, "I GUESS I AM JUST A RADICAL… I KNOW IT DOESN'T SOUND GOOD BUT I WOULD LOVE TO SEE PEARL HARBOR HAPPEN IN DC… IF THE PLAINS ON 911 WOULD HAVE HIT DC WE WOULD BE BETTER OFF RIGHT NOW… I THINK IM BECOMING ANTI GOVN."

On March 4 at approximately 3:12 p.m., Wright exchanged messages with a Facebook contact ("FB Contact 22"), as shown in Exhibit 60. Wright informed FB Contact 22 that Congress passed the American Rescue Plan Act of 2021, stating, "1.9 TRILLION JUST PASSED… THE COVID BILL WITH ALL THE PORK… AND THE GENDER BILL AND THE VOTING BILL." FB Contact 22 replied, "God help us all." Wright then sent an image in graphics interchange format (GIF) of an unknown male firing an automatic machine gun while laughing. FB Contact 22 replied, "Lol… Pretty much may be our only option." Wright replied with a thumbs up emoji and stated, "IT'S COMIN."

### *Wright's FBI Interviews*

On January 11, 2021, FBI agents interviewed Wright at his home. After being advised of nature of the interview, Wright lied to agents about being present inside the Capitol building on January 6. Wright further advised agents that he did not plan to travel to Washington, D.C., on January 17, and that he did not plan to bring any weapons to Washington, D.C. During questioning, Wright asked whether agents had a warrant. Agents informed Wright that they did not have a warrant, causing Wright to state that he was done answering questions.

During an interview with the FBI conducted on July 1, 2021, Wright later admitted that he arranged for two of his charter buses to travel to Washington, D.C. to attend the "Stop the Steal" rally. Wright confirmed that he advertised the bus trip on Facebook and that he had a strong response from individuals who wanted to attend. Wright advised agents that he charged $50 per person for the trip. Due to the popularity of the trip, Wright coordinated overflow with another charter bus company, "Barons Bus," to take people to Washington, D.C. According to Wright, Barons Bus took seven additional buses to Washington, D.C., on January 6.

Also, in a required debrief upon entering into a plea agreement, Wright informed the government that he observed another person on the East Front who was speaking into a megaphone, and who was encouraging the rioters to enter the Capitol building and asked Wright for assistance. Wright identified this person in a photograph.

### *Destruction of Evidence*

The United States has been unable to locate Exhibit 36 (Facebook live video taken inside the Rotunda) in the Facebook search warrant returns or on Wright's seized cellphone. As of January 25, 2021, the above video had been removed from Wright's Facebook page. This is

consistent with citizen tips submitted to the FBI that stated the inculpatory video had been deleted from Facebook.

*Injuries*

The government was unable to identify any specific U.S. Capitol Police officers injured by Wright during the attempted breach of the barricade line on the East Front. However, the defendant's participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attack") *supra.* His violent conduct served to incite and embolden other violent rioters around him.

## III.     THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury in the District of Columbia returned a nine-count Superseding Indictment charging John Douglas Wright with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), (2) (Count Two); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Four); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Five); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(D) (Count Six); Act of Physical Violence in the Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Seven); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Eight); and Falsification of a Material Fact, in violation of 18 U.S.C. § 1001.

On August 2, 2022, the defendant pled guilty to Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2.

## STATUTORY PENALTIES

Wright now faces sentencing on Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2.

As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding and Aiding and Abetting.

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

In this Section, the government explains why the total adjusted offense level should be 22, agrees with Probation's inclusion of an enhancement regarding injury or property damage, over Wright's objections, lays out the Sentencing Guidelines incarceration range, and moves for an upward departure.

The Probation Office calculated Wright's Guidelines range as follows:

Count Two: 18 U.S.C. §§ 1512(c)(2), 2

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[3] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[4] | +3 |
| | **Total** | **25** |

| **Combined Offense Level** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **22** |

In the plea agreement, the parties stipulated to an offense level of at least 17 before acceptance of responsibility and agreed that Wright could contest the application of the eight-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B). *See* Plea Agreement at ¶ 4(A). Wright's plea agreement contains an agreed-upon Guidelines range calculation that mirrors Probation's, but permits Wright to argue that the enhancement in U.S.S.G. 2J1.2(b)(1)(B) does not apply because his offense did not allegedly involve causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice. *See* Plea Agreement at ¶ 4(A) and (C). Further, under Wright's plea agreement, "The parties agree that, solely for the purposes

---

[3] As described in detail below, the government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[4] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Wright admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Ranges set forth above is warranted, except the Government reserves the right to request an upward departure pursuant to U.S.S.G. § 3A1.4, n. 4." *See* Plea Agreement at ¶ 4(C).

The Probation Office correctly calculated Wright's criminal history score as zero and category as I. PSR ¶ 46. Accordingly, based on the Probation Office's calculation of Wright's total adjusted offense level, after acceptance of responsibility, at 22, Wright's Guidelines range is 41 to 51 months of imprisonment. PSR ¶ 77.

### A.  The Enhancement Regarding Injury or Property Damage Applies.

United States Sentencing Guidelines ("U.S.S.G.") § 2J1.2, which applies to the "Obstruction of Justice," provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). Wright has argued in his objections to the PSR that this specific offense characteristic is not applicable to his conduct in this case. Wright asserts that his Facebook statements did not contain direct threats to police and, during the first attempted breach of the East Front barricade line, that Wright was being pushed from behind. *See* Addendum to the PSR.

The Probation Office correctly concluded that the enhancement applies to Wright's conduct. PSR at ¶ 34. Preceding the January 6 attack on the Capitol, Wright threatened physical harm on Facebook against police ("WE ARE GOING TO HAVE TO FIGHT THE BLUE TOMORROW") and elected officials ("THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE GOING IN AND DRAG THEM OUT"). *See* Exhibit 3. Wright referred to the protest

as if he were preparing to go to war. *See* Exhibit 5. Wright predicted that police lines would be breached and that rioters would push through. *See* Exhibit 3. On January 6, Wright acted on those very threats by joining a group of rioters on the East Front who pushed metal fencing against U.S. Capitol Police officers attempting to hold the barricade line. *See* Exhibits 16, 19, 20, 21, 22, 23, 24, and 63.

Wright has suggested that he was being pushed from behind by others at the barricade line, as if he was an unwilling participant in the riot. However, Exhibits 19, 21, 22, 23, 24, and 63 clearly show Wright pushing against metal fencing on his own accord and without being pushed by others. Wright's actions resulted in a temporary breach of the barricade line, where metal fencing was detached, and rioters advanced towards the Capitol building. Once the barricade line was breached, Wright stayed on the front line and continued to struggle with U.S. Capitol Police officers for control of the metal fencing. See Exhibits 16, 21, 23, 26, 27, and 28. Wright fought with U.S. Capitol Police officers for control of the barricade line for approximately 10 minutes. While Wright's efforts during the first push were unsuccessful, and he needed to take a rest, he participated in the first attempt to breach the East Front barricade line. Wright and those around him who took the affirmative step to engage physically with police—transforming the protest into a riot—set the tone for a second wave of rioters who were successful in breaching the East Front barricade line. Once that line was breached, the rioters were all in, and a brazenness within the mob was established for the group to press forward and breach the Capitol itself. Wright's statements in a live stream video taken on the East Front steps embody this very attitude, where he stated that rioters next needed to break down the doors of the Capitol and drag elected officials out of the building. *See* Exhibit 31. Sure enough, the East Front doors were breached soon

thereafter, and Wright went inside the Capitol building for approximately 12 minutes—all while Congress was, by law, required to be engaged in a joint session to certify the Electoral College vote of the 2020 Presidential election.

Upon returning to Ohio, Wright kept up his violent rhetoric, giving an interview with a newspaper where he made public statements that rioters were only getting started and that the events of January 6 constituted the first battle in a war. *See* Exhibit 41. On Facebook, Wright made similar statements, threatening that the events of January 6 were the beginning of a war. *See* Exhibits 12, 43, 45, 46, and 57. Wright bragged to his contacts on Facebook about pushing metal fencing against U.S. Capitol Police officers and expressed pride in the rioters' success in breaching the Capitol building. *See* Exhibits 25, 37, 44, and 49. Wright went so far as to say that rioters needed to visit the homes of elected officials, citizens should take up arms against the government, and he wished for the deaths of elected officials. *See* Exhibits 12, 47, 48, 54, 60, and 61. In perhaps Wright's most egregious statement, he told FB Contact 7, "THE REAL DOMESTIC TERRORISTS ARE IN DC… WHAT WE NEED IS A RESET 1776… [Elected officials] CAN'T DO NO HARM 6FT UNDER… I KNOW IT DOESN'T SOUND GOOD BUT I WOULD LOVE TO SEE PEARL HARBOR HAPPEN IN DC… IF THE [airplanes] ON [September 11, 2001] WOULD HAVE HIT DC[,] WE WOULD BE BETTER OFF RIGHT NOW." *See* Exhibit 12. Any suggestion that Wright's statements were hyperbolic or empty threats is contradicted by his own actions on January 6, in which he demonstrated that he was willing to act on his passions and physically fight for his political beliefs. Wright's conduct on January 6 resulted in "substantial interference with the administration of justice," because it contributed to the "unnecessary expenditure of substantial governmental . . . resources," warranting the enhancement under

U.S.S.G. § 2J1.2(b)(2). And the physical and violent manner in which Wright substantially interfered with the administration of justice warrants additional punishment.

In *United States v. Gregory Rubenacker*, No. 21-cr-193, Chief Judge Howell rejected the defendant's challenge to the application of U.S.S.G. § 2J1.2(b)(1)(B) on the grounds that his actions on January 6 did not cause or threaten physical injury to any person or damage any property. Rubenacker pleaded guilty to, *inter alia*, a violation of Section 1512(c)(2). The government presented evidence at sentencing that he also joined the mob that chased Officer Eugene Goodman up the staircase outside the Senate Chamber, that he refused to leave the building when officers in the Ohio Clock Corridor tried to disperse the crowd, joined in a confrontation with officers in the Rotunda, and sprayed liquid from a plastic water bottle at an officer. *See Rubenacker*, Sentencing Hearing Tr. 56:19-59:19.[5]

Chief Judge Howell determined that all of Rubenacker's actions inside the Capitol on January 6 were relevant conduct under U.S.S.G. § 1B1.3 and that the totality of that conduct was indeed threatening towards the many police officers protecting the Capitol and members of Congress on January 6. For that reason, she applied the enhancement under U.S.S.G. § 2J1.2(b)(1)(B). *See id*. 60:7-20.

Similarly, here, all of Wright's conduct described above, starting with his statements on Facebook threatening physical violence before January 6, to joining a mob of rioters who were verbally accosting U.S. Capitol Police officers maintaining the barricade line on the East Front, to leading other rioters in pushing metal fencing against U.S. Capitol Police officers, was threatening to the police officers in the Capitol building and Members of Congress on January 6.

---

[5] A copy of the transcript of the Rubenacker sentencing hearing is attached hereto as Exhibit 62.

Unlike many of the January 6 defendants who passively walked through the Capitol building and never confronted officers or ignored their commands, Wright's conduct on January 6 was sufficiently protracted, aggressive, and threatening to support the application of the Section 2J1.2(b)(1)(B) enhancement. All of Wright's conduct before, during, and after January 6, 2021, is relevant conduct, and it satisfies the enhancement under U.S.S.G. §§ 2J1.2(b)(1)(B). *See* U.S.S.G. § 1B1.3 ("Unless otherwise specified, . . . specific offense characteristics . . . shall be determined on the basis of . . . *all* acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . [and] all harm that resulted from the acts and omissions specified . . . above, and all harm that was the object of such acts and omissions.").

### B.  An Upward Departure is Warranted Pursuant to U.S.S.G. § 3A1.4, cmt. n.4

The government seeks a 2-level upward departure, pursuant to U.S.S.G. § 3A1.4, n.4, for the reasons discussed below.[6]

An upward departure from the Guidelines range is warranted on the basis of U.S.S.G. § 3A1.4, cmt. n.4 ("Terrorism"), because Wright's conviction under 18 U.S.C. § 1512(c)(2) for obstructing Congress's certification of the Electoral College vote "was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

Section 3A1.4 allows for an adjustment to the Guidelines range where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as

---

[6] The government's request for a 2-level departure pursuant to U.S.S.G. §3A1.4, n.4, is limited to the facts of this case. This request is driven by, among other things, the defendant's degree of conduct, and the degree of his intent.

defined by 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4, cmt. n.1. Where, as here, a defendant's

conviction was not for, or was not "intended to promote," an enumerated "federal crime of

terrorism," an upward departure is "warranted" under U.S.S.G. § 3A1.4, cmt. n.4(A) ("Note 4(A)")

if "the offense was calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct."[7]

Here, the PSR, Statement of Offense, and exhibits attached to this sentencing memorandum

show that Wright's conduct was calculated for these ends[8] because (1) Wright's statements and

travel in advance of the events at the Capitol on January 6 reflect the requisite intent; (2) Wright

was aware of the election certification process set to take place during Congress' Joint Session on

January 6, and he made the Capitol and elected officials inside his targets, so that he could retaliate

against or affect the course of events in the government; (3) Wright physically struggled with

---

[7] The government bears the burden to prove that the U.S.S.G. § 3A1.4 enhancement is applicable with reference to Wright's conviction and "relevant conduct" by a preponderance of the evidence. *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018). Likewise, when seeking an upward departure, "the government has the burden of proof by a preponderance of the evidence." *United States v. Walls*, 80 F.3d 238, 241 (7th Cir. 1996); *accord, United States v. Okane*, 52 F.3d 828, 835 (10th Cir. 1995). A defendant's "relevant conduct" is the conduct that "occurred during, in preparation for, or to evade responsibility for" the offense of conviction and includes "all harm that resulted from" or "was the object of" the defendant's "acts and omissions," even if uncharged. *Id*. at 187-88 (citing U.S.S.G. § 1B1.3).

[8] Notably, the upward departure under Note 4(A) may be appropriate even if influencing, affecting, or retaliating against the government was not the defendant's sole purpose or motivation. For example, the D.C. Circuit has held (applying a prior version of Section 3A1.4) that a defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was the defendant's "primary purpose." *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *see also, e.g.*, *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (offense may be calculated to influence, affect, or retaliate against government conduct even if a defendant's "particular *motivation* . . . is to impress a more established terrorist with his abilities") (emphasis in original); *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (enhancement may apply even if the defendant's conduct "was also calculated to accomplish other goals simultaneously").

police officers, further evidencing his intent to affect and retaliate against government conduct "by intimidation or coercion"; (4) Wright's words and actions at and inside the Capitol after physically engaging with police continued to evidence his intent to coerce and/or retaliate; and (5) Wright doubled down on his statements of coercive and/or retaliatory intent in the weeks following January 6, and months passed before Wright claimed to have any remorse for his actions.

First, Wright's statements and travel in advance of the events at the Capitol on January 6 reflect his intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  The evening before the events at the Capitol, on January 5 at approximately 10:54 p.m., Wright updated his Facebook status to read, "TODAY WE TAKE GEORGIA TOMORROW WE TAKE OUR COUNTRY BACK (SOUND FAMILIAR)," as shown in Exhibit 2. Three minutes later, Wright removed any doubt as to whether the preceding statement constituted merely heated political rhetoric, as opposed to an intent to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4. Specifically, Wright exchanged Facebook messages with FB Contact 1 in which he (Wright) stated, "WE ARE GOING TO HAVE TO FIGHT THE BLUE TOMORROW." Wright continued, "FROM WHAT I SEEN TONIGHT THE TEMPERS WILL BE UP TOMORROW AND POLICE LINES WILL BE BREACHED… WE HAVE TO PUSH THRU." *See* Exhibit 3. Here, Wright's own words make plain his intent to influence or affect the conduct of government or to retaliate against government conduct, not by lawful means, but by "intimidation or coercion." *See United States v. Mohammed*, No. CR 06-357 (CKK), 2022 WL 2802353, at *7 (D.D.C. July 18, 2022). Early the next morning, on January 6, Wright drove from Ohio to the District of Columbia to achieve that objective.

Second, Wright was aware of the election certification process set to take place during Congress' Joint Session on January 6, and he intended to disrupt the activities at the Capitol and the actions of elected officials inside the Capitol building, so that he could retaliate against or affect the course of events in the government. For example, on January 5, he wrote to a contact on Facebook, "THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE GOING IN AND DRAG THEM OUT." *See* Exhibit 3. Additionally, footage of Wright from outside the Capitol on January 6 shows him discussing objections by Senators and Representatives to certification. *See* Exhibit 19.

Wright was aware that actions he participated in would put the people inside the Capitol building in danger. Referring to elected officials evacuating the Capitol building on January 6, FB Contact 2 advised, "You know they are gonna sneak through the tunnels instead of coming out the building. People need to find the tunnel exits and get them." Wright replied, "DONE… ALL PLANNED OUT." FB Contact 2 replied, "I knew you was ahead of the game."

Wright's choice of target—the United States Capitol building in which Congress was undertaking a key function of government—was additional evidence of his intent to intimidate, affect, or retaliate against the government. As Judge Cooper explained in applying the terrorism enhancement in *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 198 (D.D.C. 2018), a defendant's specific intent to influence and retaliate against government conduct can often "be inferred from the defendant's choice of target." Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199. That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing

cases); *see also United States v. Hasson*, 26 F.4th 610, 626-27 (4th Cir. 2022) (affirming application of U.S.S.G. § 3A1.4 where the defendant's choice to target politicians indicated that the purpose of his offense was to coerce and retaliate against the government). Attacking the United States Capitol—the legislative seat of our government—while the entire complement of legislators and the Vice President of the United States are inside performing their constitutional and statutory duties is a strong indication of intent to influence or retaliate against the government.

Third, Wright physically struggled with police officers, further proving  his intent to influence or affect government conduct and to retaliate against it. Wright was part of the first group of rioters who pushed against the metal fencing being held by U.S. Capitol Police officers, as seen in Exhibits 19, 21, 22, 23, 24, 25, 37, and 63. Wright pushed metal fencing down onto an officer who was attempting to hold the barricade line. *See* Exhibit 22. After breaching the line of metal fencing, rioters, including Wright, continued to fight with U.S. Capitol Police officers for control of the metal fencing at the front of the barricade line, as shown in Exhibits 16, 21, 23, 26, 27, and 28. Wright participated in the fight at the barricade line for approximately 10 minutes before becoming winded and taking a break to catch his breath. Even if Wright's words were not enough, the nature and duration of Wright's physical struggle with police officers bears out the intent reflected in his January 5 statement: "WE ARE GOING TO HAVE TO FIGHT THE BLUE TOMORROW."

Fourth, Wright's words and actions at and inside the Capitol after physically engaging with police officers constitutes additional evidence of his intent. After the mass of rioters overcame U.S. Capitol Police officers' ability to secure the barricade line, Wright walked to the base of the East Front stairs. As shown in Exhibit 31, in a live video that he uploaded to Facebook, Wright

41

said, "We are in the house! All's we gotta do is get the door down now! We're gonna drag their stupid asses out! Yep, that's the stairwell. It took a lot of beating, but we got in here!" Wright's proclamation that the rioters had made it in, and only had to "get the door down now" further reflects that his criminal violation was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, because he advocated and participated in physical intervention to prevent elected officials from conducting that day's business inside the Capitol. Even once inside, Wright showed no evidence of remorse or regret. Indeed, after rioters breached the Capitol building, Wright entered through the open East Front doors, as shown in Exhibits 33 and 34. Wright then traveled further into the Capitol building to the Rotunda, as shown in Exhibits 34 and 35. While he was inside the Rotunda, Wright sat on a bench and smoked a cigarette. Wright was inside the Capitol building for approximately 12 minutes, showing no remorse or regret.

Fifth, Wright doubled down on his statements of intent in the weeks following January 6, and months passed before Wright claimed to have experience any remorse for the actions.  To the contrary, he expressed pride in his crimes. For instance, a local newspaper article quoted Wright saying on January 7, "Yesterday wasn't the end. Yesterday was the first battle of the war. I promise you." *See* Exhibit 41. Wright wrote to Facebook contacts on January 7, saying, "RESTING UP FO THE NEXT BATTLE… GETTING TO OLD TO BE A FRONTLINER," and, "IT'S FUCKING WAR TIME… NO MORE PROTESTING." *See* Exhibits 43 and 46. Perhaps most chillingly, Wright wrote to a Facebook contact that same day, protesters should go to the homes of elected officials, stating, "I THINK WE NEED TO MAKE HOME VISITS." *See* Exhibit 48. In other words, after driving to the District of Columbia, participating in the destruction that took place on

January 6, and then driving home, the defendant's impulse was to *increase* the level of intimidation and coercion of elected officials by making "home visits."  Wright's statements along these lines continued for weeks at least, including statements to Facebook contacts on February 23, 2021, shown in Exhibit 12, stating, "THERE IS ONLY ONE WAY TO GO… WAR," "THE REAL DOMESTIC TERRORISTS ARE IN DC," and "IF THE PLAINS ON 911 WOULD HAVE HIT DC WE WOULD BE BETTER OFF RIGHT NOW… I THINK IM BECOMING ANTI GOVN." These statements reflect the defendant's intent both during and after his actions at the Capitol on January 6, and that he did not experience a change of heart upon seeing the effects of the events of January 6. That is so, even if the defense introduces evidence that Wright made other "inconsistent statements," held "many false beliefs," or had "incoherent" political motivations, or if the defense characterizes Wright's statements as "mere venting." *See Van Haften*, 881 F.3d at 544-45.

In sum, the defendant's words and actions reflect the elements of U.S.S.G. § 3A1.4, Note 4(A), and an upward departure is warranted. The facts that support this departure are also relevant to the Court's assessment of the sentencing factors under 18 U.S.C. § 3553(A), which follow.

If the Court applies U.S.S.G. § 3A1.4 n.4—specifically a 2-level enhancement—the guidelines become 51 to 63 months. Given the various factors as described throughout this memorandum, the government seeks a sentence near the high-end of the new guideline range, emphasizing the defendant's terrifying rhetoric, his assaultive conduct, and his intent to disrupt Congress through intimidation and coercion. Such a departure epitomizes the crime the defendant committed that day.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

44

While looking at Wright's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Wright's crimes weigh heavily towards a significant term of incarceration. Several aggravating factors are at play in Wright's conduct that support this request. Wright's statements prior to the riot demonstrate that he was prepared for violence. As shown in Exhibit 3, the night before January 6, Wright told FB Contact 1 that he anticipated fighting police. Wright continued, "TEMPERS WILL BE UP TOMORROW AND POLICE LINES WILL BE BREACHED… WE HAVE TO PUSH THRU." Certainly, Wright carried out that very act at the Capitol on January 6 when he pushed metal fencing against U.S. Capitol Police officers, and the barricade line was temporarily breached.

Wright also anticipated that the Capitol building itself would be breached and that violence would be directed at elected officials, stating, "THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE GOING IN AND DRAG THEM OUT." The Senate chamber was in fact breached by other rioters on January 6 and only by the courageous efforts of multiple law

enforcement agencies were none of the Members of Congress or their staff members physically harmed. Wright went so far as to suggest that he could die during in the riot, adding, "HOPE I MAKE IT THROUGH." Wright expressed his frustration with lawful protesting, "PROTESTING IS GETTING US NOWHERE," and, on January 6, chose instead to engage in unlawful rioting. As shown in Exhibit 5, on January 6 at approximately 12:27 a.m., Wright informed FB Contact 2, "ALMOST WAR TIME," a mindset that he embraced on the barricade line that same afternoon.

Wright's words became actions, as detailed above in the government's argument regarding an appropriate sentencing enhancement under U.S.S.G. § 2J1.2(b)(1)(B). Wright took a position at the very front of the barricade line on the East Front on January 6, as shown in Exhibits 16 and 19. Rioters spoke directly to U.S. Capitol Police officers, attempting to talk their way closer to the Capitol building. When negotiations did not get the group what they wanted, they yelled abuse at the officers—questioning their authority and patriotism. Tempers flared, as Wright had predicted in conversations with his Facebook contacts, and he and other rioters pushed against the metal fencing in their frustration, since U.S. Capitol Police officers were not allowing them to get closer or enter the Capitol building.

As shown in Exhibits 19, 20, 21, 22, 23, 24, and 63, Wright and other rioters lifted metal fencing in the air, forcing U.S. Capitol Police officers back. At one point, Wright pushed metal fencing down onto an officer who was attempting to hold the barricade line, as shown in Exhibit 22. The barricade line was breached for the first time on the East Front and Wright was at the center of that effort, as shown in Exhibits 16, 21, 23, 26, 27, 28, and 63. After approximately 10 minutes of struggling with Wright and other rioters, U.S. Capitol Police officers were able to reconstruct the barricade line.

Fighting continued and, less than 10 minutes after Wright retreated from the front, a second wave of rioters breached the barricade line again. On this occasion, police officers were overwhelmed and fell back. Wright and his confederates who participated in the first push against the barricade line established that it was going to be a physical confrontation on the East Front, just like it was already on the West Front, and set the tone for the eventual breach of the East Front doors of the Capitol building.

Wright joined with hundreds of rioters who advanced on the Capitol building on the East Front, as shown in Exhibit 16. From the East Front stairs, he streamed live video to Facebook, as shown in Exhibit 31. Wright stated, "All's we gotta do is get the door down now! We're gonna drag their stupid asses out! ... It took a lot of beating, but we got in here!" The East Front doors were breached shortly thereafter by other rioters. Wright made his way up the stairs with hundreds of others, and he entered the Capitol building through the open East Front doors. Wright went further into the Capitol building to the Rotunda, where he live streamed video to Facebook, as shown in Exhibit 36. Wright bragged, "We are in our house!" Wright sat on a bench in the Rotunda and smoked a cigarette, a moment he would later recount with pride to FB Contact 13, as shown in Exhibit 37.

Wright continued to engage in violent rhetoric after departing Washington, D.C., and returning to Ohio, as detailed above in the government's argument regarding an appropriate sentencing enhancement under U.S.S.G. § 2J1.2(b)(1)(B). Wright threatened future violent confrontations were going to occur. As shown in Exhibit 41, Wright told a journalist, "Yesterday wasn't the end. Yesterday was the first battle of the war. I promise you." On January 7, a tipster informed the FBI that Wright advised that he planned to return to Washington, D.C., and bring

firearms. The tipster alleged that Wright told him/her that he was "going to get them this time," referring to either police or elected officials. Wright continued to use his Facebook account to glorify his and other rioters' actions on January 6, plan to attend future political rallies, use his buses to transport others to such events, and threaten physical violence. On several occasions, Wright shared the photograph of himself pushing metal fencing against U.S. Capitol Police officers, Exhibit 24, identifying himself, "I AM RED HOODIE" (*see* Exhibit 25) and bragging, "THAT FENCE IS 3 FEET IN THE AIR" (*see* Exhibit 49). Wright made threatening statements about elected officials, including, "TO[O] BAD THEY [elected officials] ARE STILL BREATHING" (Exhibit 54) and "[elected officials] CAN'T DO HARM 6FT UNDER" (*see* Exhibit 12). Wright went so far as to state, "WE NEED TO MAKE HOME VISITS" (*see* Exhibit 48), referring to rioters confronting elected officials at their residences. Wright told various Facebook contacts that he was preparing for future political violence, including, "[I am] RESTING UP FOR THE NEXT BATTLE" (*see* Exhibit 43) and "IT'S FUCKING WAR TIME… NO MORE PROTESTING" (*see* Exhibit 46). In the days, weeks, and months following the January 6 attack on the Capitol, Wright's statements on social media demonstrate he was emboldened by the events that he had witnessed and he believed future violence would be necessary to achieve his political goals.

Wright has since expressed that he had been duped by the social media that he consumed prior to the riot, and he is deeply regretful for his conduct on January 6. According to defense counsel, Wright gave an interview to the U.S. House of Representatives Select Committee investigating the January 6 attack on the Capitol, during which he made statements expressing contrition and regret. The undersigned is unaware of what Wright may have said, however, and

that interview does not provide a basis for a departure in this case. As required by his plea agreement, Wright met with the government. He expressed remorse about his conduct. As noted above, however, the information provided by Wright was known by the government and did not provide substantial assistance in the investigation or prosecution of others.

Wright's post-plea sentiments, while laudable, stand in absolute and stark contrast to Wright's actions on January 6 and statements made on social media before and after the riot. The seriousness of this offense, including the defendant's pre-planning to bring busloads of others to the protest, incitement of the mob violence on social media, physical confrontation with police at the barricade line that set the tone for violence on the East Front, entry into the Capitol building during the breach of the East Front, and many public and threatening statements afterwards made to a newspaper and on social media, demands a lengthy sentence of imprisonment.

### B.  Wright's History and Characteristics

Wright is a 55-year-old man from Canton, Ohio with his General Education Equivalency (GED). PSR ¶ 64. Wright obtained his Chauffer's License at age 18 and, later, his Commercial Driver's License (CDL). PSR ¶ 65. Wright and his wife have owned of a charter bus business based in Canton since 2010. PSR ¶¶ 54, 68. Wright has three prior arrests for disorderly conduct in 1990, assault-domestic violence in 1990, and disorderly conduct in 1997, but he does not have any criminal convictions. PSR ¶¶ 44-49.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[9] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Wright's criminal conduct, corruptly obstructing an official proceeding and aiding and abetting others to do so, is the epitome of disrespect for the law. When Wright entered the Capitol grounds and the Capitol building itself, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), *available                                                                                                    at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, No. 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Wright has now expressed remorse and contrition, his statements on social media after January 6 and to a tipster that he planned to bring firearms back to Washington, D.C., were those of a man girding himself for another battle. *See United States v. Matthew Mazzocco*, No. 21-cr-00054 (TSC), Oct. 4, 2021 Tr. at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Wright's own statements following January 6 that "YESTERDAY WAS A PRACTICE RUN," referring to the attack on the Capitol; "RESTING UP FOR THE NEXT BATTLE" and "IT'S FUCKING WAR TIME… NO MORE PROTESTING," referring to future violent confrontations; "WE NEED TO MAKE HOME VISITS," referring to rioters confronting elected officials at their residences; and "TO[O] BAD THEY ARE STILL BREATHING" and "CAN'T DO NO HARM 6FT UNDER," referring to the deaths of elected officials, demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United*

*States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *cf. United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("a Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough v. United States*, 552 U.S. 85, 91 (2007)).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As of the date of this sentencing memorandum, the government estimates that 33 felony Capitol Riot defendants have been sentenced for a violation of 18 U.S.C. § 1512(c)(2), Obstruction of an Official Proceeding: *United States v. Paul Hodgkins*, 21-cr-118-RDM (sentenced July 19, 2021), *United States v. Scott Fairlamb*, 21-cr-120-RCL (sentenced November 10, 2021), *United States v. Jacob Chansley*, 21-cr-3-RCL (sentenced November 17, 2021), *United States v. Duke*

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*Wilson*, 21-cr-345-RCL (sentenced March 4, 2022), *United States v. Matthew Ryan Miller*, 21-cr-75-RDM (sentenced May 23, 2022), *United States v. Greg Rubenacker,* 21-cr-193-BAH (sentenced May 26, 2022), *United States v. Guy Reffitt*, 21-cr-32-DLF (sentenced August 1, 2022), *United States v. Thomas Robertson*, 21-cr-24-CRC (sentenced August 11, 2022), *United States v. Joshua Pruitt*, 21-cr-23-TJK (sentenced August 29, 2022), *United States v. Richard Michetti*, 21-cr-232-CRC (sentenced September 6, 2022), *United States v. Anthony Williams*, 21-cr-377-BAH (sentenced September 16, 2022), *United States v. Tim Hale-Cusanelli*, 21-cr-37-TNM (sentenced September 22, 2022), *United States v. Christian Secor*, 21-cr-157-TNM (sentenced October 19, 2022), *United States v. Matthew Bledsoe*, 21-cr-204-BAH (sentenced October 21, 2022), *United States v. Hunter Seefried*, 21-cr-287-TNM (sentenced October 24, 2022), *United States v. Priola Cristine,* 22-cr-242-TSC (sentenced October 28, 2022), *United States v. Dustin Thompson,* 21-cr-161-RBW (sentenced November 18, 2022), *United States v. Joshua Hughes,* 21-cr-106-TJK (sentenced November 22, 2022), *United States v. Matthew Wood,* 21-cr-223-APM (sentenced November 28, 2022), *United States v. George Tenney*, 21-cr-640-TFH (sentenced December 5, 2022), *United States v. William Reid,* 21-cr-316-DLF (sentenced December 7, 2022), *United States v. Tommy Fredrick Allan,* 21-cr-064-CKK (sentenced December 8, 2022), *United States v. Nicholas Decarlo,* 21-cr-074-BAH (sentenced December 9, 2022), *United States v. Nicholas Ochs,* 21-cr-073 (sentenced December 9, 2022), *United States v. Douglas Jensen,* 21-cr-006-TJK (sentenced December 16, 2022), *United States v. Jerod Hughes*, 21-cr-106-TJK (sentenced January 6, 2023), *United States v. Erik Herrera,* 21-cr-619-BAH (sentenced January 13, 2023), *United States v. John Andries*, 21-cr-093-RC (sentenced January 17, 2023), *United States v. James Rahm, Jr.*, 21-cr-150-TFH (sentenced January 18, 2023), *United States v. Andrew Alan Hernandez*,

21-cr-445-CKK (sentenced January 27, 2023), *United States v. Christopher Moynihan*, 21-cr-226-CRC (sentenced February 1, 2023), *United States v. Joshua Haynes*, 21-cr-594-TSC (sentenced February 2, 2023), and *United States v. Kevin Seefried*, 21-cr-287-TNM (sentenced February 9, 2023).

The government estimates that this Court has sentenced two Capitol Riot defendants for a violation of 18 U.S.C. § 1512(c)(2), Obstruction of an Official Proceeding. *See Allan,* 21-cr-064-CKK (sentenced December 8, 2022, to 21 months of incarceration, 36 months of supervised release, $2,000 restitution), and *Hernandez*, 21-cr-445-CKK (sentenced January 27, 2023, to 18 months of incarceration, 36 months of supervised release, $2,000 restitution).

While there have been downward variances in a few Section 1512(c)(2) Capitol Riot cases, including in *United States v. Richard Michetti*, 21-cr-232-CRC, the facts here are dramatically different. Michetti unlawfully entered the Capitol building and travelled to the Rotunda, where he took several videos. He posted one of those videos to his social media account. Michetti yelled at Metropolitan Police officers and, at one point, briefly pinched the sleeve of an officer. While abusive and offensive, Michetti's statements at the Capitol did not include threats of violence against law enforcement or members of Congress. *See Michetti*, 21-cr-232-CRC, Government's Sentencing Memorandum, Dkt. 46 at 11 (Aug. 25, 2022) (describing Michetti shouting "we feed your family," "you are just taking orders," and "who do you work for – you get paid by us!" at Metropolitan Police officers). After January 6, Michetti exchanged text messages with a witness that showed he intended to impede the certification of the 2020 election vote count. The United States requested 18 months' imprisonment and Judge Cooper sentenced Michetti to sentenced to 9 months' imprisonment. Michetti was the ninth defendant to be sentenced for a violation of

Section 1512(c)(2), having taken early responsibility for his actions. The government did not request a sentencing enhancement for threatening physical violence under U.S.S.G. § 2J1.2(b)(1)(B).

Here, Wright made threatening statements on social media preceding January 6. He participated in the first breach of the East Front barricade line by pushing metal fencing against U.S. Capitol police officers. Wright live streamed video to social media while on the East Front stairs and inside the Rotunda. After January 6, Wright continued to make threatening statements about future political violence to a tipster, a journalist, and on social media. Wright's actions before, during, and after January 6 demand a significantly lengthier sentence than in *Michetti*.

There also have been top-end sentences in Section 1512(c)(2) Capitol Riot cases, including in *United States v. Duke Wilson*, 21-cr-345-RCL. Wilson made his way to the front line of fighting in the Lower West Terrace Tunnel area of the Capitol. There, Wilson assaulted Metropolitan Police officers with a polyvinyl chloride (PVC) pipe. Wilson threw the object at officers, struggled to obtain a police officer's shield, pushed an officer to the ground, and pushed against another officer, along with other rioters. There, the United States requested 46 months' imprisonment and Judge Lamberth sentenced Wilson to 51 months' imprisonment. The facts here are also different. Wright's conduct was not as violent as Wilson's, and Wright did not target specific police officers for assault. Unlike Wilson, Wright has since expressed remorse for his actions and statements. On the other hand, Wright's clear statements of intent – before, during, and after January 6 – clarify his eligibility for this upward departure, and the record in Wilson's case does not bear out anything remotely comparable.

There have also been mid-range sentences in Section 1512(c)(2) Capitol Riot cases, including in *United States v. Anthony Williams,* 21-cr-377-BAH. Williams posted on his Facebook at length about his participation in the January 6 attack on the Capitol, including photographs of himself inside the Capitol and threats of violence. Williams assisted other rioters use metal fencing as a ladder to climb the façade of the West Terrace to gain access to the Capitol. Williams unlawfully entered the Capitol building at the Senate Wing door and travelled through the Crypt and the Rotunda, where he took several pictures that he later posted on Facebook. After January 6, Williams bragged extensively on social media to contacts about his participation in the attack on the Capitol. The government requested 64 months' imprisonment and Chief Judge Howell sentenced Williams to 60 months' imprisonment on the 1512(c)(2) count. The facts in *Williams* most closely aligned with those in the instant case. However, Williams was found guilty after a jury trial and did not receive credit for acceptance of responsibly. Williams did not agree to interview or debrief with the government. Williams only expressed remorse after he confessed during his trial testimony to criminal conduct on January 6.

While this case advocates for application of the departure under U.S.S.G. § 3A1.4 n.4, for the reasons described above, the request is appropriately tailored to the facts of this case and is generally commensurate with the sentences of similarly situated defendants. Wright's statements evinced the applicable *mens rea*, intending to not only obstruct Congress, but do so by means of intimidation and coercion. He engaged in violence against law enforcement, particularly during relevant breaches of the Capitol grounds, permitting further penetration of the Capitol building. Finally, his actions and words accentuate his pre-January 6 understanding of the proceedings. Taking these factors into consideration, the application of the departure is not only meritorious,

but helps to underscore a case that falls out of the "heartland" covered by a specific guideline. *See* U.S.S.G., Ch.1, Pt.A(1)(4)(B).

Therefore, for the reasons stated above, granting the government's instant recommendation would not constitute an unwarranted sentencing disparity.

## V.   RESTITUTION

There are no named individual victims in Wright's case. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Wright must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Wright played in the riot on January 6.16 Plea Agreement at ¶ 9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021.[13] *Id.* Wright's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 97.

## VI.   FINE

Wright's convictions under Sections 1512 and 2 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to

---

[13] The damages figure included in Wright's plea agreement is based on an earlier estimate. As noted above in fn. 1, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

"capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 60 months, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney
DC Bar No. 481052


By: *s/ Will N. Widman*
WILL N. WIDMAN
NC Bar No. 48158
Trial Attorney, Detailee
1301 New York Avenue NW, 8th Floor
Washington, DC 20530
(202) 353-8611
Will.Widman@usdoj.gov