# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CASE NO: 1:21-CR 00341** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE COLLEEN KOLLAR KOTELLY** |
| | ) | |
| -vs- | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| **JOHN DOUGLAS WRIGHT** | ) | |
| | ) | |
| **Defendant.** | ) | |

Now comes Defendant, **JOHN DOUGLAS WRIGHT**, by and through her undersigned counsel, and hereby submits the following sentencing memorandum in the above-captioned matter.

                                                         Respectfully submitted,

                                                    /s/ Noah C. Munyer
                                                    Noah C. Munyer (0086575)
                                                    Attorney for John Douglas Wright
                                                    121 South Main Street, Suite 520
                                                    Akron, Ohio 44308
                                                    noah@ohiodefensefirm.com
                                                    (330) 253-0785 (telephone)
                                                    (330) 253-7432 (facsimile)

**MEMORANDUM**

**A.    Introduction**

Mr. Wright is fifty-five years old; he has no prior criminal record whatsoever. (Presentence Investigation Report "PSR" ¶ 44-45). Mr. Wright was raised by his mother and stepfather after his biological parents divorced when he was a young child. (PSR ¶ 51). Mr. Wright stated that his biological father suffered from Bi-Polar Disorder and alcoholism. (PSR ¶ 52). Mr. Wright was diagnosed with Bi-Polar Disorder himself in 2004 and was prescribed 40mg of Paxil which he has been taking for 20 years. (PSR ¶ 60). He stated that it is necessary for him to continue taking his Paxil prescription. (Id.) Regarding physical health, Mr. Wright suffers from Chronic Obstructive Pulmonary Disease (COPD) and experiences occasional "flare ups." (PSR ¶ 56-57). Furthermore, Mr. Wright endures knee pain and problems with his feet which greatly limit his ability to do a lot of walking. (PSR ¶ 57). Mr. Wright shares three adult children with his first wife. (PSR ¶ 53). His son passed away in 2014 of natural causes. (Id.)

Despite Mr. Wright not graduating from High School, he obtained his General Education Equivalency (GED), and has been a contributing member of society. (PSR ¶ 64). From 1990 to 2000, Mr. Wright worked for Lockheart Concrete Company in Akron, Ohio. (PSR ¶ 71). Between 2000 and 2010, Mr. Wright worked for two different charter bus companies. (PSR ¶ 69-70). In 2010, Mr. Wright and his wife started their own charter bus business, "D and L Charter" which they've owned ever since. (PSR ¶ 68).

Mr. Wright has fully accepted responsibility for his behavior and cooperated fully with law enforcement regarding his actions on 1/6/2020 and the days before and after.

2

### B. Objections to Presentence Report Enhancements

Mr. Wright objects to the enhancements in the Presentence Report at paragraphs 34 and 35 and the adjusted level they create. The PSR added eleven levels to Mr. Wright's total offense level for two instances with the "administration of justice" under U.S.S.G. §2J1.2(b). Following those recommendations would result in legal and factual error.

The relevant specific offense characteristics provide as follows:

> If the offense involved causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice*, increase by 8 levels.

U.S.S.G. §2J1.2(b)(1)(B) (emphasis added).

> If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added).

An application note states that "substantial interference with the administration of justice" includes:

> a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

These enhancements do not apply to Mr. Wright because Congress's certification of the Electoral College vote does not qualify as the administration of justice. Rather the phrase "administration of justice" refers to judicial proceedings. United States v. Richardson, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); United States v. Brenson, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as

3

appearing as a witness and giving thoughtful testimony when subpoenaed"); United States v. Warlick, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); United States v. Rasheed, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding").

Furthermore, in United States v. Aguilar, 515 U.S. 593 (1995), the Supreme Court construed obstruction of the "due administration of justice" in 18 U.S.C. § 1503 to require a showing of a nexus between the defendant's obstructive conduct and a particular *judicial or grand jury proceeding*. Id. At 599-600 (Emphasis added).  Section 1503 makes it a crime to "corruptly... influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct or impede the due administration of justice. 18 U.S.C. § 1503.  Judge McFadden in United States v. Seefried, 2022 U.S. Dist. LEXIS 196980, noted that this particular clause follows other prohibited conduct, most of which pertain to judicial proceedings. See Id. (forbidding the influencing, intimidating, or impeding any juror or officer who may be "serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate," or injuring any such officer).

This Circuit has held that Congress's joint session to count electoral votes *does not administer justice*. United States v. Montgomery, 578 F. Supp. 3d 54 (D.D.C. Case 1:21-cr-00037-TNM Document 111 Filed 09/16/22 Page 12 of 32 11 2021) ("Congress does not engage in . . . 'the administration of justice.'"); see also United States v. Sandlin, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'").

The Government in previous cases has relied on the last phrase of the Application

4

Notes to § 2J1.2, "unnecessary expenditure of substantial governmental or court resources" to argue that the enhancement encompasses more than just "judicial or grand jury hearing[s]." United States v. Seefried, Government Sentencing Memo at 29. However, this definition is too broad. As Judge McFadden explained in Seefried that, "if courts may enhance an obstruction-related sentence by eleven levels any time the Government can show that the offense caused unnecessary expenditure of its resources, 'substantial interference with the administration of justice' could encompass just about anything." Seefried, 2022 U.S. Dist. LEXIS 196980.

The plain meaning of the phrase "administration of justice" also seems to involve a judicial proceeding. Judge McFadden in Seefried used dictionary definitions to determine the plain meaning. United States v. Seefried, 2022 U.S. Dist. LEXIS 196980. Black's Law Dictionary defines "administration of justice" as "[t]he maintenance of a right within a political community by means of force of the state" and "the state's application of the sanction of force to the rule of right." *Administration of Justice*, Black's Law Dictionary (11th ed. 2019). Similarly, "due administration of justice" is defined as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties." Id. Judge McFadden held that "[t]hese definitions suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." Seefried, 2022 U.S. Dist. LEXIS 196980.

The phrase "administration of justice" cannot mean one thing in the statutes and another thing in the Sentencing Guidelines unless those authorities specifically define it differently. Thus, "administration of justice" as applied in 2J1.2 must involve a nexus to a

judicial proceeding.

Even if this Court is to find that the certification of the Electoral College votes is an official proceeding that involves "the administration of justice", the § 2J1.2 enhancements do not apply factually. There is no evidence that Mr. Wright was "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." U.S.S.G. §2J1.2(b)(1)(B). The PSR says that he "pushed against a metal barricade against federal law enforcement officers." (PSR ¶ 25). This conduct does not constitute physical injury or property destruction. "Threatening to cause physical injury to a person" is assault and "interference" simply is not assault. If a defendant intended his acts to interfere with a person but not threaten him or her with bodily injury, he is not guilty of assault. United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990); see also United States v. Roberts, 915 F.2d 889, 890 (4th Cir. 1990), cert. denied, 498 U.S. 1122, 111 S. Ct. 1079, 112 L. Ed. 2d 1184 (1991). Here, there is no evidence that Mr. Wright's pushing of a barricade was intended to convey a threat to officers that Mr. Wright would physically harm them. Furthermore, unlike many rioters, Mr. Wright was not yelling or harassing law enforcement with threats of violence. While Mr. Wright posted threats on social media on or about January 5th through January 8th, his conduct on January 6th shows that he was not prepared nor intended to carry-out such threats. (PSR ¶ 28).

The "substantial interference" specific offense characteristic apply does not apply either. U.S.S.G. § 2J1.2(b)(2). The PSR does not elaborate on what specific facts support this enhancement. (PSR ¶ 35). The common link between the examples of "substantial interference" with the administration of justice in the relevant application note is acts that materially affect the *outcome* of the obstructed proceeding; for example, a prematurely

terminated investigation procured through perjury. U.S.S.G. § 2J1 cmt. n. 1.  Here, Mr. Wright's actions had no causal relationship with the outcome or duration of the joint session. It was suspended approximately 20 minutes before Mr. Wright entered the Capitol building and did not recommence until hours after he exited.  Mr. Wright assaulted no one, broke nothing, and encountered neither legislators nor congressional staff.  In fact, Mr. Wright's conduct was virtually indistinguishable from that of hundreds of Class B misdemeanants who entered the Capitol Building.

**C.     The Goals of Sentencing – 18 U.S.C. § 3553(a)**

After United States v. Booker, federal sentencing is vastly different.  Treating the Guidelines as advisory requires the Court to consider the guideline range calculation as merely one of many factors in determining a sentence *no greater than necessary to achieve the goals of sentencing* as set forth in 18 U.S.C. § 3553(a)(2). See, Gall v. United States, 128 S.Ct. 586,597 n.6 (2007); Kimbrough v. United States, 128 S.Ct. 558, 570 (2007).  The overrideing principle and mandate of § 3553(a) requires district courts to impose a sentence "sufficient but not greater than necessary," to achieve the four purposes of sentencing as set forth in Section § 3553(a)(2): (a) retribution; (b) deterrence; (c) incapacitation; and (d) rehabilitation. Id.

The "sufficient but not greater than necessary" requirement has been referred to as the "parsimony provision." See, United States v. Denardi, 892 F.2d 269, 276-77 (3rd Cir. 1989).  This Circuit has found that the parsimony provision serves as the "guidepost for sentencing decisions post-Booker" and sets an independent limit on the sentence a court may impose. United States v. Ferguson, 456 F.3d 660, 667 (6th Cir. 2006), see also United States v. Cull, 446 F.Supp.2d 961, 963 (E.D. Wis. 2006).  Since § 3553(a) requires a

sentence to be no greater than necessary to meet the four purposes of sentencing, imposition of a sentence greater than necessary to meet those purposes is reversible, even if within the applicable guideline range.

### D. The Guidelines and Other Factors Courts Must Consider in Determining Punishment that Fulfills the Sentencing Mandate under § 3553(a)

In determining the sentence minimally sufficient to comply with Section 3553(a) purposes of sentencing, the court must consider several factors. Those factors include:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant

(2) The need for the sentence imposed -

　　(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

　　(B) To afford adequate deterrence to criminal conduct;

　　(C) To protect the public from further crimes of the defendant;

　　(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The advisory guideline range;

(5) Any pertinent policy statement issued by the Sentencing Commission

(6) The need to avoid unwarranted sentence disparities; and

(7) The need to provide restitution to any victims of the offense

See, 18 U.S.C. 3554(a)(2007).  See generally, Rita v. United States, 127 S.Ct. 2456, 2463-65 (2007); Kimbrough v. United States, 128 S.Ct. 558 (2007); Gall v. United States; 128 S.Ct. 586 (2007); Spears v. United States, 129 S.Ct. 840 (2009).

While district courts must in all cases "consider" the guideline range, Booker, 543 U.S. 220, 245-46, the Guidelines do not subordinate the other factors § 3553(a). As this Circuit has pointed out, the sentencing mandate under § 3553(a) serves as "the guidepost for sentencing decisions post-Booker." Ferguson, 456 F.3d at 667, and the Guidelines carry no more weight than any other factor under § 3553(a). Importantly, a sentencing court may not presume that a sentence within the guideline range is reasonable. Rita, 127 S.Ct. at 2463-65.

In a post-Booker world federal district judges have significant discretion to impose sentences below (or above) those called for under the Sentencing Guidelines. See, Spears v. United States, 129 S.Ct. 840 (2009); Kimbrough v. United States, 128 S.Ct. 558, 570 (2007); Gall v. United States; 128 S.Ct. 586 n.6 (2007). A non-guideline sentence may not be presumed to be unreasonable, and district courts need not impose sentences greater than they believe necessary out of fear of reversal. Rita at 2467. Instead after determining the Guideline range, the sentencing court may decide that a sentence in that range:

> should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "Heartland" to which the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.O, perhaps because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. See Rule 32(f).

Rita, 127 S.Ct. at 2465. District courts may even consider arguments that a particular guideline reflects "an unsound judgment" generally. Rita at 2468; Spears at 843. The appellate courts should not disturb the court's judgment if the sentencing judge provides reasons for the sentencing decision. Rita, at 2468.

Under §35539(a)(1) the history and characteristics of the defendant, several factors to determine what sentence is necessary are relevant. Mr. Wright has no prior criminal

9

history, he has been on GPS unit supervised via federal pretrial release with no issues in that time, further his medical issues and age make are additional factors in favor of his supervision in the community.

E. **Avoiding unwarranted sentence disparities**

Section 3553(a)(6) – the need to avoid unwarranted sentence disparities – is particularly relevant to the present case. A sentence above 10 months imprisonment would create unwarranted sentencing disparities. The conduct at the Capitol on January 6th, 2021, produced hundreds of cases, many of which involve 18 U.S.C. § 1512(c)(2). While Mr. Wright's conduct was inexcusable, it pales in comparison to other rioters, many of whom have been sentenced on the low end of the guideline range or received downward departures. For example:

1. Matthew Wood was sentenced to 12 months' home confinement. 1:21-CR-00223-APM
   - Also plead guilty to 18 U.S.C. 1752(a)(1-2); 40 U.S.C. 5104(e)(2)(C, D, G)
   - Was the 10th rioter to illegally enter the Capitol Building
   - Breached the House Speaker's Suite of Offices and got to within a single door of Speaker Pelosi's staff who was hiding
   - Was part of the battle in the rotunda
   - Remained in Capitol Building for approximately 80 minutes
   - Deleted potential evidence from his cell phone
2. Paul Hodgkins was sentenced to 8 months' incarceration. 1:21-CR-00188-RDM
   - Did not engage in any acts of intimidation or violence and did not destroy any property
   - Remained in Capitol Building for approximately 35 minutes
3. Richard Michetti was sentenced to 9 months' incarceration.1:21-CR-00232-CRC
   - Was part of the mob trying to force its way past a line of MPD officers in the hallway by the Old Senate Chamber
   - Supported actual assaults on MPD officers by other rioters

- Remained in the Capitol Building for approximately 45 minutes

4. Troy Sargent was sentenced to 14 months' incarceration. 1:21-CR-00258-TFH
   - Plead guilty to 18 U.S.C. § 231(a)(3); 18 U.S.C. § 111(a)(1); 18 U.S.C. § 1752(a)(1)(2)(4); 40 U.S.C. § 5104(e)(2)(F)
   - Assaulted a Capitol police officer

5. Christine Priola was sentenced to 15 months' incarceration. 1:22-CR-00242-TSC
   - Made it to the Senate floor
   - Remained in Capitol Building for approximately 30 minutes
   - Deleted potential evidence from her cell phone

6. Hunter Seefried was sentenced to 24 months' incarceration. 1:21-CR-00287-TNM
   - Also plead guilty to 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D, G)
   - Used his fist to clear glass that remained in one of the broken windowpanes, clearing the way for rioters to enter the interior of the building through the window.
   - Fourth rioter to enter the Capitol Building
   - Was among the small crowd that chased Capitol Police Officer, Eugene Goodman up the stairs outside the Senate Chamber
   - Remained in the Capitol for approximately twenty-five minutes

7. Matthew Miller was sentenced to 33 months' incarceration. 1:21-CR-00075-RDM
   - Also plead guilty to 18 U.S.C. § 111(a)(1)
   - Threw a full beer can and batteries in the direction of law enforcement and sprayed a fire extinguisher onto law enforcement

8. Dustin Thompson was sentenced to 36 months' incarceration. 1:21-CR-00161-RBW
   - Also plead guilty to 18 U.S.C. § 641 and 2; 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D, G)
   - Looted the Senate Parliamentarian's office
   - Threw objects at police officers and hit one on the hand with a metal baton causing a bruise

9. Joshua Hughes was sentenced to 38 months' incarceration. 1:21-CR-00106-CKK
   - Was at the very front of the mob that forced the bike rack barriers down and breached the police line
   - Was among the first rioters to reach the Upper West Terrace

- Was the ninth rioter to enter the Capitol building
- Was among the small crowd that chased Capitol Police Officer Eugene Goodman up the stairs outside the Senate Chamber
- Made it to the Senate floor

10. Greg Rubenacker was sentenced to 41 months' incarceration. 1:21-CR-00193-BAH
    - Also plead guilty to 18 U.S.C. § 231(a)(3); 18 U.S.C. § 111(a) 18 U.S.C. § 1752(a)(1-2, 4); 40 U.S.C. § 5104(e)(2)(D, E, F, G)
    - Was among the small crowd that chased Capitol Police Officer, Eugene Goodman up the stairs outside the Senate Chamber

11. Scott Fairlamb was sentenced to 41 months' incarceration. 1:21-CR-00120-RCL
    - Also plead guilty to 18 U.S.C. § 111(a)(1)
    - Punched a MPD officer in the face
    - Armed himself with a police baton and incited violence outside the Capitol

12. Jacob Chansley was sentenced to 41 months' incarceration. 1:21-00003-RCL
    - The QAnon shaman
    - Among the first 30 rioters inside the Capitol Building
    - Made it to the Senate floor and left a threatening note for then-Vice President Mike Pence
    - Remained in the Capitol Building for approximately 60 minutes

13. Christian Secor was sentenced to 42 months' incarceration. 1:21-CR-00157-TNM
    - Reached the floor of the Senate and sat in the chair where the Vice President would have been presiding if he had not been evacuated
    - Part of a group that pushed through a doorway that was blocked by at least three police officers

14. Tim Hale-Cusanelli was sentenced to 48 months' incarceration. 1:21-CR-00037-TNM
    - Also plead guilty to 18 U.S.C. § 1752(a)(1-2); 40 U.S.C. § 5104(e)(2)(D, G)
    - Entered the Capitol Building less than 90 seconds after the first rioter entered the building
    - Intervened in the arrest of another rioter

15. Matthew Bledsoe was sentenced to 48 months' incarceration. 1:21-CR-00204-BAH
    - Also plead guilty to 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D, G)

- Remained in Capitol Building for 22 minutes
16. Duke Wilson was sentenced to 51 months' incarceration. 1:21-CR-00345-RCL
    - Also plead guilty to 18 U.S.C. § 111(a)(1)
    - Punched law enforcement officers, attempted to take their shields, and threw objects at them.

The conduct of fellow rioters in the aforementioned cases illuminate that Mr. Wright's involvement on January 6th was minimal at most. Unlike many rioters, Mr. Wright did not menace, chase, threaten or assault law enforcement. He did not loot the Capitol, nor did he destroy government property or encourage others to do the same. In fact, Mr. Wright acted in a manner defending the capitol police as captured on video.

The worst conduct Mr. Wright displayed on January 6, was pushing on a barricade outside on the Capitol Grounds. This alone should not warrant a severe punishment for Mr. Wright.

At approximately 2:11 p.m. the Capitol Building was breached by rioters on the western side and by 2:30 p.m. rioters had forced their way inside the Capitol on the eastern side. At approximately 2:39 p.m. Mr. Wright entered the Capitol Building. When he entered the side door it had already been breached by rioters and alarms were sounding. While inside, Mr. Wright walked through the Capitol Rotunda, took a video, posted the video to Facebook Live, then exited the building, and never re-entered. In total, Mr. Wright was inside the Capitol Building for twelve minutes.

In sum, a sentence in line with the PSR, recommendations by the Government would create a significant number of unwarranted sentence disparities.

F.   **The seriousness of the offense and deterrence**

The Court must consider "the need for the sentence imposed … to reflect the seriousness of the offense" and the "afford adequate deterrence to criminal conduct" and to

"protect the public from further crimes of the defendant." § 3553(a)(2).

Mr. Wright has been on GPS monitoring through Federal Pretrial Services for twenty-Four (24) without any violations whatsoever.

The penalties Mr. Wright faces because of this case are more than sufficient to deter him, and certainly a vast number of people from the general public from ever protesting inside the Capitol Building. Considering Mr. Wright's crime involved a 12-minute trespass inside the Capitol Building, a downward departure from Mr. Wright's offense level of 12 serves as severe specific and general deterrence. Let alone the looming threat of the Probation Officer's recommendation of 41-51 months incarceration, and the Government's request for an upward departure.

**G.    Upward Departure**

The government indicated in January of 2023 that it would be seeking an upward departure in our case pursuant to 3A1.4(n)(4) of two (2) levels, to a guideline offense level of twenty-four (24). This application is inappropriate in Mr. Wright's case given the combination of mitigation, service to the community, and his relative lack of sophistication regarding the working of the government.

Mr. Wright did engage in a very regrettable and inflammatory speech on Facebook on and around January 6, 2021, and he wishes he could take back those statements. However, elevating Mr. Wright's conduct and intention in line with 3A1.4 Terrorism enhancement misses the mark on both sides. It overstates Mr. Wright's role, ability and intent, and it weakens the heinous actions of actual individuals intent on carrying out acts of Terrorism. This enhancement would allow the government or the court to add twelve (12) levels and take Mr. Wright from Criminal History 1 to a criminal history IV. This could possibly change

his exposure from guideline 15-21 months to a possible guideline of 120-150 months. This further emphasizes the severity of this enhancement's purpose under the Federal Sentencing Guidelines and makes it clear that it does not and should not apply to Mr. Wright.

**CONCLUSION**

Based upon the foregoing reasons, Mr. Wright respectfully requests that this Court impose a sentence below the guidelines which allows Mr. Wright to maintain his business and remain with his family. If this Court deems incarceration necessary, Mr. Wright further requests that this Court recommend that he serve any sentence imposed at the F.C.I. in Elkton, Ohio.

Respectfully submitted,

/s/ Noah C. Munyer
Noah C. Munyer (0086575)
Attorney for John Douglas Wright
121 South Main Street, Suite 520
Akron, Ohio 44308
noah@ohiodefensefirm.com
(330) 253-0785 (telephone)
(330) 253-7432 (facsimile)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of February 2023 a copy of this Motion filed electronically, Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

/s/ Noah C. Munyer
Noah C. Munyer (0086575)
Attorney for John Douglas Wright