**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

JOHN DOUGLAS WRIGHT,
           Defendant.

Criminal Action No. 21-341 (CKK)

<u>**MEMORANDUM OPINION**</u>
(March 4, 2023)

      Defendant John Douglas Wright was charged by Indictment and pled guilty to

Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§

1512(c)(2) and 2, for his actions participating in the insurrection at the United States Capitol on

January 6, 2021.  *See* Superseding Indictment, ECF No. 37; Minute Entry, Aug. 2, 2022; Plea

Agreement, ECF No. 62.  Defendant is scheduled to appear for sentencing of this offense on

March 6, 2023.  *See* [69] Order.

      In his Sentencing Memorandum, Defendant objects to sentencing enhancements

suggested by the United States Probation Office and advocated for by the Government.  *See* [72]

Def.'s Sent'g Mem. at 3.  Specifically, as will be addressed herein, Defendant objects to the

application of specific offense characteristics U.S.S.G. §2J1.2(b)(1)(B) and (b)(2).  *Id.*

Defendant first argues that "[t]hese enhancements do not apply to Mr. Wright because

Congress's certification of the Electoral College vote does not qualify as the administration of

justice.  Rather the phrase 'administration of justice' refers to judicial proceedings." *Id.*

Defendant then argues that "[e]ven if this Court is to find that the certification of the Electoral

College votes is an official proceeding that involves 'the administration of justice', the § 2J1.2

enhancements do not apply factually." *Id.* at 6.

The Court finds, in line with the vast majority of judges in the United States District Court for the District of Columbia, that the phrase "administration of justice" in U.S.S.G. §2J1.2(b)(1)(B) and (b)(2) includes the Electoral College certification.  The Court also finds that Defendant's conduct related to the January 6, 2021 insurrection factually satisfies the standards for both enhancements. The Court therefore overrules Defendant's objections as to U.S.S.G. §2J1.2(b)(1)(B) and (b)(2).

## I. BACKGROUND

### A.  Defendant Wright's Participation in the Capitol Riot

The Court provides a brief summary of the Defendant's participation in the riot at the United States Capitol on January 6, 2021.  At the sentencing on March 6, 2023, the Court will recite a more detailed factual background outlining Defendant's criminal conduct.  The Court also references additional facts in its discussion below.

Defendant John Douglas Wright is a charter bus business owner from Canton, Ohio. Gov.'s Sent'g Mem., ECF No. 70 at 4.  Defendant organized two buses to travel to Washington, D.C. on January 6, 2021 to protest the results of the Electoral College vote and support then-President Donald J. Trump.  *Id.* at 2, 6; Gov.'s Ex. 6.  He charged $50 per person to ride on these buses and ultimately transported approximately 100 people from Ohio to Washington, D.C. Gov.'s Sent'g Mem., ECF No. 70 at 2, 6; Gov.'s Ex. 7.

In the days leading up to January 6, 2021, Defendant shared numerous posts and sent messages on Facebook regarding the events planned for January 6.  *See, e.g.*, Gov.'s Exs. 2, 3, 5. In these messages, Defendant conveyed that he anticipated violence at the Capitol and planned to participate in that violent conflict.

When Defendant's buses arrived in Washington, D.C. on January 6, they parked at Union

Station.  Gov.'s Sent'g Mem., ECF No. 70 at 2, 7.  He and others on the buses walked directly to the East Front of the Capitol and did not attend the "Stop the Steal" rally on the National Mall. *See id.* at 7.  Once at the East Front, Defendant joined the growing mob of rioters.  There, he joined others in watching a live stream of the Electoral College certification and celebrating when states objected.  *See id.* at 11; Gov.'s Ex. 19 at 19:10.

Defendant soon made his way to the very front of a barricade line at the East Front.  *See* Gov.'s Sent'g Mem. at 13.  Once at the front, Defendant Wright and other rioters began engaging with U.S. Capitol Police officers.  Right before rioters starting pushing the police barricade, Defendant yelled at a U.S. Capitol Police officer, "Don't touch me!" to which the officer responded, "I didn't touch you," and Defendant shouted back, "You just did!"  Gov.'s Ex. 19 at 44:25.  Three seconds later, a fellow protestor announces that "it's about to be rushed" as protestors begin pushing metal barricades against the Capitol Police.  *Id.* at 44:28.  Defendant is seen lifting and pushing a barricade against Capitol Police officers, forcing them to retreat. Gov.'s Ex. 22 at 00:30; *see also* Gov.'s Ex. 23 at 00:00; Gov.'s Exs. 24, 26, 27.

Defendant fought with U.S. Capitol Police officers at the barricade line for approximately ten minutes.  Gov.'s Sent'g Mem., ECF No. 70 at 19.  His struggle against U.S. Capitol police fatigued him and he needed to rest; he later told agents that he was winded and needed to catch his breath.  *Id.*

While Defendant sat and rested, other insurrectionists continued the surge that he had led. The rioters ultimately breached the barricade, forcing their way past U.S. Capitol Police officers and toward the East Front stairs of the Capitol.  *Id.* at 19.  Wright was among the group who made it to the base of the East Front stairs just after 2:00 pm.  *Id.*; *see also* Gov.'s Ex. 31.  Once there, Defendant shouted "All's we gotta do is get the door down now! We're gonna drag their

stupid asses out!"  Gov.'s Ex. 31 at 00:09.  A few minutes later, Defendant participated in a

"Stop the Steal" chant before starting and leading a "Whose house? Our house!" call-and-

response.  Gov.'s Ex. 32 at 00:19, 00:40.  Defendant then shouted "Them crook's gotta go! Time

to get rid of the criminals!"  *Id.* at 00:52.  The Court understands Defendant to be referring to

legislators in the Capitol.

Defendant entered the Capitol building at approximately 2:39 pm through the East Front

doors.  Gov.'s Ex. 33 at 25:00.  Once inside, he entered the Rotunda, *see* Gov.'s Exs. 34, 35 at

00:19.  He remained in the Rotunda for approximately ten minutes.  Gov.'s Sent'g Mem., ECF

No. 70 at 22.  Defendant then exited the Capitol at approximately 2:50 pm.  Gov.'s Ex. 33 at

36:40.  At approximately 4:00 pm, Defendant departed Washington, D.C. via one of his charter

buses for Ohio.  Gov.'s Sent'g Mem., ECF No. 70 at 23.

The following day, on January 7, 2021, a tipster informed the FBI that the Defendant told

him he planned to return to Washington, D.C. on January 17, 2021 and bring firearms.  *Id.* at 25.

This information is consistent with an image Defendant posted on his Facebook page on January

5, 2021 promoting an "Armed March on Capitol Hill and All State Capitols" scheduled to occur

on January 17 and stating "Come armed at your personal discretion."  *Id.*; Gov.'s Ex. 4.

Also on January 7, 2021, Defendant participated in an interview with the Canton

Repository newspaper.  *See* Gov.'s Ex. 41.  Among other remarks, Defendant stated, "Yesterday

wasn't the end.  Yesterday was the first battle of the war.  I promise you."  *Id.*  That same day,

Defendant sent numerous messages on Facebook discussing the events of the day prior and

referring to "war" and "battle."  *See, e.g.*, Gov.'s Exs. 45, 46, 48.  He continued to send messages

intimating violence throughout the coming months and, in some, wishing death on legislators in

D.C.  *See, e.g.*, Gov.'s Exs. 12, 48, 54, 60.

**B.  Criminal Case Against Defendant Wright**

On May 5, 2021, the Government returned an [6] Indictment as to Defendant John Douglas Wright.  That was later replaced with the [37] Superseding Indictment, in which Wright was charged with Civil Disorder, in violation of 18 U.S.C. § 231(a)(2); Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); Disorderly Conduct in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(D); Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); and False Statement to Federal Agent, in violation of 18 U.S.C. § 1001.

On August 2, 2022, Defendant pled guilty to Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2.  *See* Minute Entry, Aug. 2, 2022; Plea Agreement, ECF No. 62.  That statute states that "[w]hoever corruptly… [] obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both."  18 U.S.C. §§ 1512(c)(2).

**C.  Sentencing Enhancements Under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2)**

In Defendant Wright's plea agreement, the parties agreed to certain sentencing guidelines computations.  Plea Agreement, ECF No. 62 at 2; *see also* Final Presentence Investigation Rep., ECF No. 64 at 4.  They agreed that the base offense level is 14 under U.S.S.G. § 2J1.2.  Plea Agreement, ECF No. 62 at 2; *see also* Final Presentence Investigation Rep., ECF No. 64 at 4.

The parties also agreed to one specific offense characteristic: a three-level enhancement for "substantial interference with the administration of justice" under U.S.S.G. § 2J1.2(b)(2). Plea Agreement, ECF No. 62 at 2. The plea agreement explained that the Government would be seeking an eight-level increase pursuant to U.S.S.G. § 2J1.2(b)(1)(B) for "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice" and that the Defendant reserved the right to contest the application of that enhancement. *Id.* at 2–3. Finally, it stated that the Government would also be recommending a two-level reduction for acceptance of responsibility; however, if the Court were to find that the eight-level increase is applicable, the parties agreed that a three-level reduction for acceptance of responsibility would instead apply. *Id.* at 3. Applying the Government's recommendations would result in a total adjusted offense level of 22. *Id.*; *see also* Final Presentence Investigation Rep., ECF No. 64 at 4.

The United States Probation Office filed its [63] Draft Presentence Investigation Report, in which it expressed support for both the three-level and eight-level enhancements. *See* Presentence Investigation Rep., ECF No. 63 at 8. The Government did not have any objections to the [63] Report. *See* Final Presentence Investigation Rep., ECF No. 64 at 20. However, after reviewing the Presentence Report, Defendant objected to the eight-level increase under U.S.S.G. § 2J1.2(b)(1)(B). *Id.* Defense counsel asserted: "Yes my client did write stupid things on Facebook, but there were no direct threats to law enforcement. The photo o[f] him pushing on the barricade, was well back from the building, during the first fence breach, my client was also being pushed from behind by others." *Id.* In response, the Probation Office maintained its position that the eight-level increase was warranted, explaining that "defendant threatened to physically fight with police, drag members of congress out of chambers, and breach the police

line. The defendant pushed against law enforcement officers with others using a barricade to breach the police line. This, in turn, allowed other rioters to enter the building." *Id.*

Notably, Defendant did not at that time object to the three-level increase under U.S.S.G. § 2J1.2(b)(2). *See id.*

In the Government's [70] Sentencing Memorandum, they argue that the eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B) applies. Gov.'s Sent'g Mem., ECF No. 70 at 33–37. They also state that the three-level enhancement under U.S.S.G. § 2J1.2(b)(2) applies. *Id.* at 32, 32 n.4, 35–36. However, they did not devote as much attention to the (b)(2) enhancement because Defendant had agreed to it in the plea agreement and had not objected to it in the Presentence Investigation Report.

In the Defendant's [72] Sentencing Memorandum, he for the first time argues that neither U.S.S.G. § 2J1.2(b)(1)(B) *nor* (b)(2) applies. Def.'s Sent'g Mem., ECF No. 72 at 3. Both specific offense characteristics require "the administration of justice" to have been hindered in some way. Defendant argues that "[t]hese enhancements do not apply to Mr. Wright because Congress's certification of the Electoral College vote does not qualify as the administration of justice. Rather the phrase 'administration of justice' refers to judicial proceedings." *Id.* Defendant also argues that "[e]ven if this Court is to find that the certification of the Electoral College votes is an official proceeding that involves 'the administration of justice', the § 2J1.2 enhancements do not apply factually." *Id.* at 6. As for § 2J1.2(b)(1)(B), Defendant continues to maintain that he did not threaten to cause physical injury to a person or property. *Id.* And for § 2J1.2(b)(2), Defendant now argues that "[t]he common link between the examples of 'substantial interference' with the administration of justice in the relevant application note is acts that materially affect the *outcome* of the obstructed proceeding," and that here, his "actions had no

causal relationship with the outcome or duration of the joint session." *Id.* at 6–7 (emphasis in original).

In the analysis that follows, the Court addresses Defendant's objections that the U.S.S.G. §2J1.2(b)(1)(B) and (b)(2) enhancements do not apply.

## II. DISCUSSION

The Court first addresses the proposed enhancement under U.S.S.G. §2J1.2(b)(1)(B) before turning to that under U.S.S.G. §2J1.2(b)(2).

### A. U.S.S.G. § 2J1.2(b)(1)(B)—Threat of Physical Injury to Person or Property

Pursuant to U.S.S.G. § 2J1.2(b)(1)(B), the guidelines state that "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels."  As noted above, Defendant argues that the enhancement under U.S.S.G. § 2J1.2(b)(1)(B) does not apply for two reasons.  First, he argues that "Congress's certification of the Electoral College vote does not qualify as the administration of justice."  Def.'s Sent'g Mem., ECF No. 72 at 3.  He continues that "the phrase 'administration of justice' refers to judicial proceedings." *Id.*  Second, Defendant argues that he did not threaten to cause physical injury to a person or property such that even if § 2J1.2(b)(1)(B) applied to the congressional proceeding, it would not apply to him factually. *Id.* at 6.  The Court now considers these in turn.

#### 1. "Administration of Justice" Includes Congress's Certification of Electoral College Votes

Considering the phrase "administration of justice" in its context, the Court agrees with the majority of judges in the United States District Court for the District of Columbia that "administration of justice" in § 2J1.2(b)(1)(B) includes the certification of the Electoral College votes.

The statutory relationship between 18 U.S.C. §§ 1512(c) and U.S.S.G. § 2J1.2 supports a finding that § 2J1.2 (b)(1)(B) is applicable here.  Part J of the Sentencing Guidelines covers "Offenses Involving the Administration of Justice" and includes Section 2J1.2, titled "Obstruction of Justice."  The Guidelines list the statutory provisions to which § 2J1.2 applies; that list includes 18 U.S.C. § 1512.  *See* U.S.S.G. § 2J1.2, Commentary.  Defendant Wright pled guilty to that statute—specifically, 18 U.S.C. §§ 1512(c)(2) and 2.  *See* Plea Agreement, ECF No. 62.  That the offense to which Defendant pled guilty, 18 U.S.C. §§ 1512, is explicitly referenced and covered by Guideline § 2J1.2 indicates that the specific offense characteristics within § 2J1.2 would apply to those convicted of violating 18 U.S.C. §§ 1512.  To suggest otherwise—i.e., that the specific offense characteristics of § 2J1.2 only apply to *some* of the statutes referenced—would be counterintuitive and an unreasonable interpretation.  *Accord* Transcript of Sent'g at 69, *United States v. Rubenacker*, No. 21-cr-193 (D.D.C. June 7, 2022) (BAH), ECF No. 70 (hereinafter "*Rubenacker* Transcript");[1] Transcript of Sent'g at 35–36, *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Aug. 25, 2022), ECF No. 175 (hereinafter "*Reffitt* Transcript").[2]

---

[1] There is "no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings."

[2] "[O]nce I've decided that this crime can be prosecuted under [18 U.S.C. § 1512(c)(2)], the guidelines very clearly direct that statute to 2J1.2, which is entitled 'Obstruction of Justice.' And it's hard for me to conclude simply because the Sentencing Commission didn't anticipate and incorporate every definition in the statute in the shorthand, if you will, for these enhancements, that that means that the Commission intended to exclude this offense. Right?... [I]t seems like it would lead to unwarranted sentencing disparities to apply it, these enhancements, in only cases involving what we classically think of as administration of justice.  It seems like the Commission would need to be clear that we are carving out this type of offense for me to draw the conclusion that this administration of justice language that's used as the title to Part J… makes these adjustments not applicable in this context."

The fact that § 2J1.2 nor its Commentary do not explicitly reference congressional proceedings such as the Electoral College certification does not mean that such proceedings are excluded from the scope of "administration of justice."  Numerous other judges in the United States District Court for the District of Columbia have held similarly.  *See, e.g.*, *Rubenacker* Transcript at 69;[3] *Reffitt* Transcript at 37–38.[4]

The Commentary to § 2J1.2 explains that "[t]his section addresses offenses involving the obstruction of justice generally prosecuted under the above-referenced statutory provisions. Numerous offenses of varying seriousness may constitute obstruction of justice."  U.S.S.G. § 2J1.2, Commentary, Background.  The Court does acknowledge that the "exemplar offenses" that then follow "evoke traditional notions of judicial or enforcement proceedings" and that "[n]one of them relate to a legislative proceeding."[5]  *United States v. Seefried*, No. 21-cr-287, 2022 WL 16528415, at *9 (D.D.C. Oct. 29, 2022) (TNM).  However, they are just that: *examples* of "[n]umerous offenses of varying seriousness" that "*may* constitute obstruction of justice." U.S.S.G. § 2J1.2, Commentary, Background (emphasis added).  The canon of *expressio unius est exclusion alterius*—"mention of one thing implies exclusion of another thing," *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)—does not apply when context does not indicate that the list is meant to be exclusive, *Doe v. Secs. & Exchange Comm'n*, 28 F.4th 1306, 1314 (D.C. Cir. 2022).  There is nothing indicating that the list included in the Commentary was meant to be

---

[3] "[T]he lack of express reference to congressional proceedings does not mean that the sentencing commission meant to exclude such proceedings from the coverage of the [specific offense characteristics] with use of the phrase 'administration of justice.'"

[4] § 2J1.2 "generally refers to the administration of justice, and I don't think that we can infer simply because the Commission didn't include the phrase 'official proceeding of Congress' that it meant for that type of offense prosecuted under Section 1512(c)(2) to not be subject to the same aggravating factors that the Commission has delineated here."

[5] However, the list does include "obstructing a civil or administrative proceeding," which is unlike a judicial proceeding.  *See* U.S.S.G. § 2J1.2, Commentary, Background.

exclusive or that congressional proceedings should not be included.  Additionally, the *expressio unius* canon does not apply "unless it is fair to suppose that [the provision's writers] considered the unnamed possibility and meant to say no to it."  *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).  It is hard to imagine the Sentencing Commission having considered an insurrection at the United States Capitol disrupting the certification of Electoral College votes when they created § 2J1.2 in 1987.  As another court has noted, "[t]he events of January 6th were [] novel… so the lack of precedent applying this [specific offense characteristic] to similar congressional proceedings is unsurprising, and not determinative."  *Rubenacker* Transcript at 71.

Dictionary definitions do not undermine the understanding that "administration of justice," as in § 2J1.2 (b)(1)(B) and (b)(2), includes certification of the Electoral College vote. To begin, Black's Law Dictionary defines "administration of justice" as "[t]he maintenance of right within a political community by means of the physical force of the state; the state's application of the sanction of force to the rule of right."  *Administration of Justice*, Black's Law Dictionary (11th ed. 2019).  This definition alone does not foreclose congressional proceedings from being included in "administration of justice;" "that the state would use mechanisms, such as police or prosecutors, to force compliance with or maintain a right… is not necessarily tied to a court or a particular tribunal."  *Rubenacker* Transcript at 72.  Rather, as other courts have explained, the nature of the certification of the Electoral College vote demonstrates that the certification proceedings are in fact "maintaining 'the right within a political community,' as Black's Law Dictionary states, to have votes counted in a particular manner, using 'the physical force of the state' in the form of law enforcement officers located in and around the Capitol to secure the proceedings."  *Id.* at 75.  Other courts have relied on different definitions, such as those from Webster's Third New International Dictionary, to reach similar conclusions.  *See,*

*e.g.*, Transcript of Sent'g at 16, *United States v. Miller*, No. 21-cr-75 (D.D.C. May 27, 2022) (RDM), ECF No. 73 (hereinafter "*Miller* Transcript").[6]

However, one court in this District was unconvinced by these analyses, instead concluding that "administration of justice" does not include congressional proceedings like the Electoral College certification for the purposes of § 2J1.2 enhancements.  *See Seefried*, 2022 WL 16528415, at *3–4.  Yet even that court recognized that "the dictionary definitions here are a bit unwieldy" and that it "must look to context" before noting that "this is a close interpretive call." *Id.* at *4, *11.  This Court agrees insofar as context is important—specifically, the statutory context surrounding § 2J1.2 and 18 U.S.C. §§ 1512, as discussed above.

The Court also finds that Defendant's reliance on case law considering the phrase "administration of justice" in other contexts to be unavailing.  Defendant Wright, like other January 6th defendants facing this enhancement, points to a statement in *United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021) (RDM) that "Congress does not engage in … 'the administration of justice.'"  Def.'s Sent'g Mem., ECF No. 72 at 4 (citing *Montgomery*, 578 F. Supp. 3d at 66).  Defendant argues that this establishes that "Congress's joint session to count electoral votes *does not administer justice*" for the purposes of § 2J1.2 enhancements.  *Id.* (emphasis in original).  However, the court in *Montgomery* was not dealing with application of the specific offense characteristics in § 2J1.2; rather, it was discussing whether the Electoral College certification qualifies as an "official proceeding" within the meaning of 18 U.S.C. § 1512(c)(2).  *Montgomery*, 578 F. Supp. 3d at 62.  Other judges on this court have since

---

[6] "If one looks at Webster's Third New International Dictionary, administration in this sense means to mete out, and justice means fair treatment.… One could say that the Congress was sitting in an adjudicative role, and that it was adjudicating in some very, very limited sense, subject to very substantial constraints, the results of the election."

emphasized that *Montgomery* was a "[t]otally different context" and is "irrelevant to the question of whether the [specific offense characteristics] in the guideline at 2J1.2 for interfering with the administration of justice apply to obstruction to a congressional proceeding.… The phrase 'administration of justice' does not even appear in the statute that was under scrutiny by [the judge] in *Montgomery*." *Rubenacker* Transcript at 39, 64–65.  Furthermore, in subsequent January 6th cases, the judge who decided *Montgomery* has made this point himself.  In *United States v. Miller*, he applied the § 2J1.2(b)(2) enhancement after explaining that *Montgomery* is not in contradiction with applying § 2J1.2 in the January 6th context.  *See Miller* Transcript at 16–17; *see also* Transcript of Sent'g at 6, *United States v. Hodgkins*, No. 21-cr-188 (D.D.C. July 22, 2021) (RDM), ECF No. 36 (also applying a 2J1.2 enhancement).

Defendant also cites *United States v. Sandlin*, 575 F. Supp. 3d 16 (D.D.C. 2021) (DLF), in which the court stated that it "will not read an 'administration of justice' requirement into 'official proceeding.'"  Def.'s Sent'g Mem., ECF No. 72 at 4 (citing *Sandlin*, 575 F. Supp. 3d at 24).  As above in *Montgomery*, this comment was part of a discussion regarding what constitutes an offense under § 1512(c)(2) and not regarding sentencing enhancements.  The judge who decided *Sandlin* made this clear when discussing § 2J1.2 enhancements at a later sentencing in another case, stating "I did not decide this guideline issue in [*Sandlin*]," thereby distinguishing the statement on which Defendant now relies.  *See Reffitt* Transcript at 35.  Even more significant is that that judge went on to apply the § 2J1.2(b)(1)(B) and (b)(2) enhancements in the case in which he made the original remark.  *See* Transcript of Sent'g at 36, *United States v. Sandlin*, No. 21-cr-88 (D.D.C. Feb. 7, 2023) (DLF), ECF No. 103 (hereinafter "*Sandlin* Transcript").  The Court reiterates that these limiting understandings of the phrase "administration of justice" are from other contexts not at issue here.

Finally, to the extent the Court is interested in adhering to an understanding of § 2J1.2's applicability that is consistent with other courts of this District, that also bolsters the Court's conclusion.  Numerous other courts have applied § 2J1.2 enhancements in January 6th cases, many faced with defendants' objections, as here, and explicitly finding that "administration of justice" applies to the certification of the Electoral College votes.  *See, e.g.*, *Rubenacker* Transcript;[7] *Reffitt* Transcript; *Miller* Transcript; *Sandlin* Transcript; Transcript of Sent'g, *United States v. Robertson*, No. 21-cr-34-1 (D.D.C. Sept. 2, 2022) (CRC), ECF No. 149 (hereinafter "*Robertson* Transcript"); Transcript of Sent'g, *United States v. Hodgkins*, No. 21-cr-188 (D.D.C. July 22, 2021) (RDM), ECF No. 36; Transcript of Sent'g, *United States v. Fairlamb*, No. 21-cr-120 (D.D.C. Jan. 20, 2023) (RCL), ECF No. 72; *accord* Final Presentence Investigation Rep., *United States v. Fairlamb*, No. 21-cr-120 (D.D.C. Oct. 29, 2021), ECF No. 48.  This Court, too, has applied a § 2J1.2 enhancement in a January 6th case.  *See* Final Presentence Investigation Rep., *United States v. Allan*, No. 21-cr-64 (D.D.C. Nov. 9, 2022) (CKK), ECF No. 42.

Altogether, the Court agrees with the majority of judges in this District that, particularly in light of the statutory scheme of 18 U.S.C. §§ 1512(c)(2) and U.S.S.G. § 2J1.2, the phrase "administration of justice" in the context of § 2J1.2 includes the certification of the Electoral College votes.

### 2. Defendant's Conduct Threatening to Cause Physical Injury

Defendant next objects that "[t]here is no evidence that Mr. Wright was 'causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice'" and therefore the eight-level enhancement does not apply.  Def.'s

---

[7] Defendant Rubenacker made the same objections as Defendant Wright, arguing that the phrase "administration of justice" only applies to quasi-judicial proceedings.  *See Rubenacker* Transcript at 37.

Sent'g Mem., ECF No. 72 at 6 (citing U.S.S.G. §2J1.2(b)(1)(B)).  The Government submits that

U.S.S.G. § 2J1.2(b)(1)(B) does apply because the Defendant's offense involved "threatening to

cause physical injury to a person… in order to obstruct the administration of justice."  Gov.'s

Sent'g Mem., ECF No. 70 at 32 n.3.

      The Court finds that Defendant's offense—Obstruction of an Official Proceeding, in

violation of 18 U.S.C. §§ 1512(c)(2), 2—involved threatening to cause physical injury to

legislators and law enforcement officers in order to obstruct the certification of the Electoral

College vote.

      To begin, Defendant's Facebook messages in the hours leading up to the insurrection

provide important context for his actions at the Capitol.  Defense counsel argues that Defendant

"did write stupid things on Facebook, but there were no direct threats to law enforcement."  Final

Presentence Investigation Rep., ECF No. 64 at 20.  Later, Defendant admits that he "posted

threats on social media on or about January 5th through January 8th."  Def.'s Sent'g Mem., ECF

No. 72 at 6.  The Court now recounts some of these threats.

      Late at night on January 5, 2021, Defendant Wright messaged a friend "WE ARE

GOING TO HAVE TO FIGHT THE BLUE TOMORROW."  Gov.'s Ex. 3.  He continued,

"FROM WHAT I SEEN TONIGHT THE TEMPERS WILL BE UP TOMORROW AND

POLICE LINES WILL BE BREACHED… WE HAVE ENOUGH TO PUSH THRU."  *Id.*

Defendant then wrote "THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE

GOING IN AND DRAG THEM OUT."  *Id.*  Then, just after midnight the morning of January 6,

2021, Defendant messaged another friend, stating "ALMOST WAR TIME".  Gov.'s Ex. 5.

Defendant's friend said, "You know they are gonna sneak through the tunnels instead of coming

out the building. People need to find the tunnel exits and get them," presumably referring to

legislators at the Capitol.  *Id.*; *see also* Gov.'s Sent'g Mem., ECF No. 70 at 6 (noting that this was "[r]eferring to elected officials evacuating the U.S. Capitol building").  To this, Defendant responded: "DONE[.] ALL PLANNED OUT."  Gov.'s Ex. 5.

The Court finds that Defendant's Facebook messages convey true threats to cause physical injury to both law enforcement officers and legislators. Fighting the blue, pushing through police lines, dragging out legislators, and getting to legislators as they try to escape— these are not empty remarks, especially in light of Defendant's conduct once he arrived in Washington, D.C.  *Accord* Gov.'s Sent'g Mem., ECF No. 70, at 35 ("Any suggestion that Wright's statements were hyperbolic or empty threats is contradicted by his own actions on January 6, in which he demonstrated that he was willing to act on his passions and physically fight for his political beliefs.").

When Defendant arrived in D.C. at approximately 11:30 am, he went directly to the East Front of the Capitol rather than first going to the "Stop the Steal" rally on the National Mall.  *See* Gov.'s Sent'g Mem., ECF No 70 at 7.  Once at the East Front, Defendant joined a swell of other rioters that was growing in size.  There, he watched a live stream of the Electoral College certification; he triumphantly raised his fist, cheering and shouting "We got an objection from Pennsylvania and Arizona.  We got two!"  *See id.* at 11; Gov.'s Ex. 19 at 19:10.  Defendant soon made his way to the very front of a barricade line at the East Front.  *See* Gov.'s Sent'g Mem. at 13.

Once at the front, Defendant Wright and other rioters began engaging with U.S. Capitol Police officers.  Mere moments before rioters started pushing the police barricade, Defendant yelled at a U.S. Capitol Police officer, "Don't touch me!" to which the officer responded, "I didn't touch you," and Defendant shouted back, "You just did!"  Gov.'s Ex. 19 at 44:25.  Three

seconds later, a fellow protestor announces that "it's about to be rushed" as protestors begin

pushing metal barricades against the Capitol Police. *Id.* at 44:28.  Defendant is seen lifting and

pushing a barricade against Capitol Police officers, forcing them to retreat.  Gov.'s Ex. 22 at

00:30; *see also* Gov.'s Ex. 23 at 00:00; Gov.'s Ex. 24; Gov.'s Ex. 26; Gov.'s Ex. 27.  Defendant

claims that he was "being pushed from behind by others."  Final Presentence Investigation Rep.,

ECF No. 64 at 20.  However, video and photographs refute this; in some footage, no one was

within a few feet of Defendant either behind him or to his left while he was forcing the barricade

back against the officers.  *See, e.g.*, Gov.'s Ex. 22 at 00:30; Gov.'s Ex. 26.

Defendant also argues that pushing a metal barricade against federal law enforcement

officers "does not constitute physical injury or property destruction."  Def.'s Sent'g Mem., ECF

No. 72 at 6.  He continues that "there is no evidence that Mr. Wright's pushing of a barricade

was intended to convey a threat to officers that Mr. Wright would physically harm them."  *Id.*

The Court finds otherwise.  Defendant—of his own accord with no crowd pushing him—lifted

and pushed a metal police barricade against Capitol Police officers protecting the U.S. Capitol so

forcefully that they could not withstand his effort.  Multiple officers are seen struggling to hold

on to the barricade that Defendant was pushing.  *See* Gov.'s Ex. 22 at 00:30.  To the extent there

remains doubt as to Defendant's intent with the barricades, his later statements are illuminating.

In numerous Facebook messages on January 7, 2021, Defendant shared photographs and

identified himself pushing the barricade.  *See* Gov.'s Ex. 37, 49.  One message included a

photograph of him pushing the barricade against three police officers before writing proudly,

"THAT FENCE IS 3 FEET IN THE AIR" and calling the police "FUCKERS."  Gov.'s Ex. 49.

Defendant's actions at the barricade line threatened to cause physical injury, if they did

not in fact cause physical injury.  Other courts in this District come to the same conclusion based

on the similar conduct of other January 6th defendants.  *See, e.g.*, *Rubenacker* Transcript at 59 (where "[a]ngry members of the mob including the defendant… refused to follow the orders of the police, overwhelmed law enforcement, and engaged in pushing and threatening—the bottom line is: This is threatening conduct"); *Reffitt* Transcript at 38 ("failure to stand down and follow the lawful commands of the officers was threatening to them"); *Robertson* Transcript at 15 (finding it threatening where defendant was "standing in front of [a police officer] with a backpack and a gas mask holding a stick at port arms standing right in front of [the officer] and not moving out of the way and making contact with it as [the officer] tried to organize a line to fight off a violent mob").

Defendant fought with U.S. Capitol Police officers at the barricade line for approximately ten minutes.  Gov.'s Sent'g Mem., ECF No. 70 at 19.  His struggle against U.S. Capitol police fatigued him and he needed to rest; he later told agents that he was winded and needed to catch his breath.  *Id.*  That Defendant's violent and forceful actions were physically taxing on him bolsters a finding that they were threatening to cause injury.

This bolsters a finding that Defendant's actions were violent and forceful—in other words, threatening to cause injury—such that they were physically taxing on him.

While Defendant sat and rested, other insurrectionists continued the surge that he had led. The rioters ultimately breached the barricade, forcing their way past U.S. Capitol Police officers and toward the East Front stairs of the Capitol.  *Id.*  Wright was among the group who made it to the base of the East Front stairs just after 2:00 pm.  *Id.*; *see also* Gov.'s Ex. 31.  Once there, Defendant shouted "All's we gotta do is get the door down now! We're gonna drag their stupid asses out!"  Gov.'s Ex. 31 at 00:09.  At least one other court in this District has found a similar remark about dragging legislators out of the Capitol to constitute a threat for the purposes of §

2J1.2(b)(1)(B).[8]  *See Reffitt* Transcript at 20–24, 38.  A few minutes later, Defendant participated in a "Stop the Steal" chant before starting and leading a "Whose house? Our house!" call-and-response.  Gov.'s Ex. 32 at 00:19, 00:40.  Defendant then shouted "Them crook's gotta go! Time to get rid of the criminals!"  *Id.* at 00:52.  The Court understands Defendant to be referring to legislators in the Capitol.

Defendant sent messages on Facebook after January 6 underscoring and reiterating these threats toward lawmakers.  For example, on January 7, Defendant wrote that he was planning on going back to DC "LOADED" and that "I THINK WE NEED TO MAKE HOME VISITS," Gov.'s Ex. 48—in other words, going "so far as to say that rioters needed to visit the homes of elected officials" to engage in violent acts, Gov.'s Sent'g Mem., ECF No. 70 at 35.  In February 2021, Defendant wrote to a Facebook friend, "TO[O] BAD THEY ARE STILL BREATHING." Gov.'s Ex. 54.  These comments suggest that Defendant had similar animus and motivations on January 6.

Defendant finally entered the Capitol building at approximately 2:39 pm through the East Front doors.  Gov.'s Ex. 33 at 25:00.  Once inside, he entered the Rotunda, *see* Gov.'s Exs. 34, 35 at 00:19.  He remained in the Rotunda for approximately ten minutes.  Gov.'s Sent'g Mem. at 22.  Defendant then exited the Capitol at approximately 2:50 pm.  Gov.'s Ex. 33 at 36:40.

The Court's above recitation of Defendant's behavior while at the U.S. Capitol Grounds demonstrate that he threatened to cause physical injury.  But Defendant has one more argument yet: that he "was not yelling or harassing law enforcement with threats of violence."  Def.'s Sent'g Mem., ECF No. 72 at 6.  This assertion is plainly undermined by video evidence.  As

---

[8] Recall that Defendant also made this reference the night of January 5, 2021, writing on Facebook: "THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE GOING IN AND DRAG THEM OUT."  Gov.'s Ex. 3.

mentioned above, Defendant yelled at a Capitol Police officer "Don't touch me!" just moments

before pushing a barricade into the officers.  *See*  Gov.'s Ex. 19 at 44:25.  Then, once at the base

of the East Front stairs, just steps from entering the Capitol building, he shouted "All's we gotta

do is get the door down now! We're gonna drag their stupid asses out!"  Gov.'s Ex. 31 at 00:09.

Later, he said "Time to get rid of the criminals!"  Gov.'s Ex. 32 at 00:52.  These cries constitute

Defendant's "yelling or harassing law enforcement with threats of violence."  But even if that

were not the case, "[a] verbal threat is not required" under 2J1.2(b)(1)(B).  *Robertson* Transcript

at 15; *see also Rubenacker* Transcript at 60 ("the fact that [a defendant] was not heard to utter

explicit verbal threats of physical violence toward law enforcement does not bar application of

the 8-level [specific offense characteristic]").

       After Defendant left Washington, D.C. and returned to Ohio, he maintained his violent

rhetoric.  Just as the Court considers Facebook messages from before Defendant's participation

in the Capitol siege to provide relevant context, so too do his statements afterwards.

       For example, Defendant made various comments referring to January 6 as a battle that

was part of a larger war.  On January 7, 2021, Defendant participated in an interview with the

Canton Repository newspaper.  *See* Gov.'s Ex. 41.  Among other remarks, Defendant stated,

"Yesterday wasn't the end.  Yesterday was the first battle of the war.  I promise you."  *Id.*  After

sharing the article with friends on Facebook, who told him "You're a star!", Defendant wrote "I

ALWAYS TELL IT LIKE IT IS."  Gov.'s Ex. 43.  That same day, Defendant posted on

Facebook, "YESTERDAY WAS A PRACTICE RUN."  Gov.'s Ex. 45.  He also sent Facebook

messages saying "IT'S FUCKING WAR TIME," Gov.'s Ex. 46, and that he was "RESTING UP

FOR THE NEXT BATTLE," Gov.'s Ex. 43.

       On February 23, 2021, Defendant wrote in a Facebook message that "THERE IS ONLY

ONE WAY TO GO[:] WAR."  Gov.'s Ex. 12.  He states that "THE REAL DOMESTIC

TERRORIST ARE IN DC."  *Id.*  Defendant writes "WHAT WE NEED IS A RESET 1776…

CAN'T DO HARM 6FT UNDER… I WOULD LOVE TO SEE PEARL HARBOR HAPPEN IN

DC… IF ALL THE PLAINS ON 911 WOULD HAVE HIT DC WE WOULD BE BETTER

OFF RIGHT NOW."  *Id.*  Defendant's belligerent messages calling for war and wishing death

upon legislators in D.C. serve to underscore Defendant's threatening conduct on January 6 and

reflect his mindset and intentions that day.

     After reviewing Defendant's participation in the insurrection on January 6, the Court

finds that Defendant's "offense involved… threatening to cause physical injury to a person… in

order to obstruct the administration of justice."  *See* U.S.S.G. § 2J1.2(b)(1)(B).  Before, during,

and after January 6, 2021, Defendant wanted to protest the certification, push through police

lines and "fight the blue," enter the U.S. Capitol, "Stop the Steal," and harm the legislators inside

the Capitol who were participating in a constitutionally-mandated congressional proceeding.

The actions described above were all taken to further Defendant's intent to obstruct the

certification of the Electoral College votes, the offense for which he was convicted.

*     *     *

     The Court therefore overrules Defendant's objection and finds that U.S.S.G. §

2J1.2(b)(1)(B) does apply here.  The Court will apply the eight-level enhancement, as will be

discussed further at the sentencing hearing on March 6, 2023.

**B.  U.S.S.G. § 2J1.2(b)(2)—Offense Resulted in Substantial Interference**

     The Court next turns to Defendant's objection that § 2J1.2(b)(2) does not apply.  Pursuant

to U.S.S.G. § 2J1.2(b)(2), "[i]f the offense resulted in substantial interference with the

administration of justice, increase by 3 levels."

To begin, the Court calls attention to the fact that Defendant agreed to this three-point enhancement under § 2J1.2(b)(2), *see* Plea Agreement, ECF No. 62 at 2, and did not object to it in the Presentence Investigation Report, *see* Final Presentence Investigation Rep., ECF No. 64 at 20.  Therefore, the Probation Office did not have the opportunity to respond to any such objection, nor was the Government prompted to focus on it in its Sentencing Memorandum. Instead, in his Sentencing Memorandum, Defendant for the first time argues that the enhancement under U.S.S.G. § 2J1.2(b)(2) does not apply because, as with § 2J1.2(b)(1)(B), "Congress's certification of the Electoral College vote does not qualify as the administration of justice" and, even if it did, the enhancement does not apply factually.  Def.'s Sent'g Mem., ECF No. 72 at 3, 6.  Upon receipt of a late objection such as at issue here, the Court ordinarily would request the Probation Office to respond.  However, the Court will not do so here, especially because the analysis is the same under both § 2J1.2(b)(2) and (b)(1)(B) with respect to "administration of justice," as will be discussed below.

The Court now addresses Defendant's two theories as to why § 2J1.2(b)(2) does not apply.

1. **"Administration of Justice" Includes Congress's Certification of Electoral College Votes**

The Court's analysis for the three-level enhancement under § 2J1.2(b)(2) is the same as above regarding the eight-level enhancement under § 2J1.2(b)(1)(B).  In other words, because the Court found that "administration of justice" in § 2J1.2(b)(1)(B) applies to the Electoral College certification proceeding, the Court finds that it also does in § 2J1.2(b)(2).

Other January 6th defendants have admitted this outright; for example, in *United States v. Reffitt*, the defendant agreed on the record that the three-level enhancement would apply given the court's ruling on the administration of justice issue as to the eight-level enhancement.  *See*

*Reffitt* Transcript at 39.  Additionally, this Court has applied § 2J1.2(b)(2) before in similar circumstances.  *See* Final Presentence Investigation Rep., *United States v. Allan*, No. 21-cr-64 (D.D.C. Nov. 9, 2022) (CKK), ECF No. 42.

**2.  Defendant's Conduct Substantially Interfered with the Administration of Justice**

Defendant next objects that § 2J1.2(b)(2) does not apply to him factually because his actions did not substantially interfere with the administration of justice.  Def.'s Sent'g Mem., ECF No. 72 at 6.  "'Substantial interference with the administration of justice' includes… the unnecessary expenditure of substantial government or court resources."  U.S.S.G. § 2J1.2(b)(2), Application Note 1.  The Government argues that Defendant's offense led to such an unnecessary expenditure.  Gov.'s Sent'g Mem., ECF No. 70 at 32 n.4, 35.  The Government claims that the riot in which Defendant participated "resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses…. [L]aw enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters."  *Id.* at 32 n.4.

The Court finds that Defendant's offense—Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2—resulted in substantial interference with the certification of the Electoral College vote.

Defendant Wright was an active and willing participant in a mob of insurrectionists who stormed and breached United States Capitol, causing millions of dollars of damage and diverting police resources from numerous states, among other harms.  Defendant argues that his "conduct was virtually indistinguishable from that of hundreds of Class B misdemeanants who entered the Capitol Building" and therefore he cannot have caused substantial interference to warrant the three-level enhancement.  Def.'s Sent'g Mem., ECF No. 72 at 7.  But although Defendant was

only one member of the overall mob, together, the thousands of members of that mob caused significant harm.

In a bench trial in which a January 6th defendant was charged with Disorderly and Disruptive Conduct in a Restricted Building in violation of U.S.C. § 1752(a)(2), this Court explained that "[j]ust as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood.… Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption." *United States v. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. 2022) (CKK).  The same idea applies here.  Many rioters collectively caused the unnecessary expenditure of substantial government resources, and each individual rioter, including Defendant Wright, contributed to that unnecessary expenditure.

Even more apt, other courts in this District have specifically held that the Government need not show but-for causation between a particular defendant's conduct and the particular expenditure of government resources.  *Rubenacker* Transcript at 77–78.  Rather, the Government need only show a general causal tie between the defendant's actions and the otherwise unnecessary expenditure.  *Id.* at 77.  That court went on to explain that where "the defendant acted in concert with hundreds of other rioters to obstruct congressional proceedings; no one person in the crowd could have created the same degree of havoc, chaos, and disruption as the collective group did, and the government need not demonstrate a specific defendant as singularly responsible for the unnecessary expense."  *Id.* at 78.  "[T]he government need only show a direct causal line from all of the participants in the mob, which includes a specific defendant, that collectively resulted in a situation causing the unnecessary expenditure of substantial governmental resources."  *Id.*  This Court adopts that reasoning here as for Defendant Wright.

Finally, the Court addresses Defendant's meritless argument that "[t]he common link

between the examples of 'substantial interference' with the administration of justice in the relevant application note is acts that materially affect the *outcome* of the obstructed proceeding," and that here, his "actions had no causal relationship with the outcome or duration of the joint session" because the session "was suspended approximately 20 minutes before Mr. Wright entered the Capitol building and did not recommence until hours after he exited." Def.'s Sent'g Mem., ECF No. 72 at 6–7 (emphasis in original).  However, the examples to which Defendant refers are presented in a non-exhaustive list and, moreover, do not in fact require that the outcome of a given proceeding be affected.  *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Additionally, numerous other courts in this District have found January 6th defendants to have caused substantial interference, going on to applying § 2J1.2(b)(2), without requiring the outcome of the certification to have been impacted.  *See, e.g.*, *Miller* Transcript; *Rubenacker* Transcript; *Robertson* Transcript.  As for duration, the Court finds that Defendant's actions *did* impact the duration of the joint session, for similar reasons as articulated above: Defendant was part of a collective group that caused the delay and he, as a member of that group, contributed to the delay.  *Accord Miller* Transcript at 18 (finding that "the proceedings certifying the presidential election were delayed by several hours; and that the entire United States Congress sat until after midnight… and all the attendant costs that come with the entire Congress sitting in this extraordinary session, along with the enormous law enforcement presence that was required to allow them to do that" constituted substantial interference on the part of the defendant).

The Court finds that Defendant's "offense resulted in substantial interference with the administration of justice," specifically "the unnecessary expenditure of substantial government or court resources."  U.S.S.G. § 2J1.2(b)(2), Application Note 1.

\*        \*        \*

The Court therefore overrules Defendant's objection and finds that U.S.S.G. § 2J1.2(b)(2) does apply here.  The Court will apply the three-level enhancement, as will be discussed further at the sentencing hearing on March 6, 2023.

### III. CONCLUSION

The Court finds that the Electoral College certification constitutes the "administration of justice" in the context of U.S.S.G. §2J1.2(b)(1)(B) and (b)(2).  The Court also finds that Defendant John Douglas Wright's conduct before and on January 6, 2021 satisfies the requirements of U.S.S.G. §2J1.2(b)(1)(B) and (b)(2).  Accordingly, the Court overrules Defendant's objections and will apply the requisite eight-level and three-level enhancements.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge